[No. 57038-8. En Banc. May 14, 1992.]

ROY W. ROBINSON, ET AL, *Appellants*, v. THE CITY OF SEATTLE, ET AL, *Respondents.*

36

40

*Richard B. Sanders*, for appellants.

*Mark H. Sidran, Prosecuting Attorney*, and *Sandra M. Watson, Assistant*, for respondents.

*Ronald A. Zumbrun, Edward J. Connor, Jr., John M. Groen*, and *Ben J. Gantt, Jr.*, on behalf of Pacific Legal Foundation, amicus curiae for appellants.

*Richard L. Andrews, Bellevue City Attorney*, and *Richard Gidley, Deputy*, on behalf of Washington State Association of Municipal Attorneys, amicus curiae for respondents.

GUY, J. — Plaintiffs appeal from a dismissal of their class action. Roy and Kathleen Robinson and that class of persons similarly situated seek reversal of a trial court's rulings which dismissed their civil rights actions against the City of Seattle and individual officials, applied a 3-year statute of limitation to their claims for refunds of payments they made under the City of Seattle's Housing Preservation Ordinance, and denied their request for reasonable attorney fees. The City of Seattle (City) cross-appeals, arguing the trial court erred in awarding the partial refund. We will refer to the class in this action as the Robinsons.

FACTS
Background

The Robinsons' appeal comes to this court following two decisions of this court which held invalid both sections of the City's Housing Preservation Ordinance (HPO).[1] By the time of this court's decisions upholding invalidation of the HPO, the Robinsons had paid substantial sums to the City under the ordinance.

The Housing Preservation Ordinance, former Seattle Municipal Code (SMC) 22.210, was originally enacted in

---

[1] *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 780 P.2d 838 (1989); *San Telmo Assocs. v. Seattle*, 108 Wn.2d 20, 735 P.2d 673 (1987).

1980. Its stated purpose was to mitigate the loss of low income housing in the city caused by demolition for development and to reduce the hardships experienced by displaced tenants. Former SMC 22.210.020. With some exceptions, the original version of the ordinance (HPO-1) required that before a change of use or demolition of housing units could occur, a housing demolition license fee had to be paid to the City in an amount prorated to the number of units to be demolished, with the fee to be used for building and rehabilitation of low income housing. In its provisions for the protection of low income tenants the ordinance additionally required that tenants be given a 120-day notice of an intended demolition, and that low income tenants be either relocated or, at the option of the landlord, paid up to $1,000 per family in relocation assistance.

Approximately 2 years after the passage of the City's HPO-1, the State Legislature amended RCW 82.02.020 to provide in part that "[n]o county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings . . . or on the development, subdivision, classification, or reclassification of land." *See* Laws of 1982, 1st Ex. Sess., ch. 49, § 5. Later that same year this court, without reference to RCW 82.02.020, invalidated two county ordinances which imposed fees on new residential developments as offsets to increased service costs and for the construction of park land. *Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 650 P.2d 193 (1982). This court in *Hillis Homes* held the development fees were invalid taxes (because their primary purpose was to raise money since the fees were fiscal and not regulatory), and thus held the ordinances requiring the fees invalid as there was no express authority permitting such taxes. After the *Hillis Homes* decision, the Seattle city attorney determined that neither *Hillis Homes* nor RCW 82.02.020 invalidated HPO-1. The city attorney reasoned that HPO-1 was a regulatory enactment and a demolition fee, not a development fee, and

advised the Department of Construction and Land Use (the Department) to continue enforcement.

In October 1983, the King County Superior Court granted San Telmo Associates a declaratory judgment, ruling the HPO-1 housing replacement fee provision an invalid tax prohibited by RCW 82.02.020, and awarded San Telmo, its heirs and assigns an injunction against the City's enforcement of HPO-1. The city attorney advised the Department that the superior court ruling was erroneous. The city attorney also indicated that because it was a limited ruling, applying only to San Telmo, the City would not appeal as it planned to redraft HPO-1. The city attorney advised the Department that HPO-1 was enforceable against nonparties to the action.[2] The City did not appeal, complied with the injunction vis-a-vis San Telmo Associates while continuing to enforce the ordinance against all others similarly situated, and later began redrafting the HPO.

A new draft of HPO-1 was completed by a task force in spring 1984. The new draft was presented to the City Council in September 1984. In July 1985, the City repealed HPO-1 and enacted a new version of the HPO, which we shall call HPO-2. HPO-2 had the same purpose as HPO-1 but did not require payments to the City. Instead, it required owners to replace a percentage of the housing demolished, with the option that a landowner could make a payment to the City rather than build replacement housing. Significantly, HPO-2 added an administrative relief provision which exempted owners from the replacement housing requirements if compliance would deprive the owners of all economically viable use of the property. HPO-2 still included, as did HPO-1, tenant notice and relocation assistance provisions.

After the City enacted HPO-2, San Telmo Associates again filed suit challenging the housing replacement provisions. In July 1986, the King County Superior Court declared the housing replacement provision an unauthorized

---

[2]We note that the city attorneys involved in this appeal are not the attorneys who provided the legal advice mentioned in this opinion.

tax or fee, and granted an injunction. The city attorney concluded the Superior Court's decision was in error, would be reversed on appeal, and advised the Department the City was appealing the ruling to the Supreme Court. The City was also advised to continue enforcement against nonparties to San Telmo's action, based on the reasoning that the superior court ruling affected only parties to the suit. The Department continued enforcement except against San Telmo.

In April 1987, this court held the housing replacement provisions of HPO-2 invalid as an unauthorized tax under RCW 82.02.020. *San Telmo Assocs. v. Seattle*, 108 Wn.2d 20, 735 P.2d 673 (1987). This court noted that HPO-2 differed materially from HPO-1:

There is no indication that the City attempted to adopt the second ordinance merely to avoid the trial court order invalidating the first ordinance; rather, the second ordinance was specifically enacted with changes designed to cure the defects in the original ordinance.

*San Telmo*, at 23. The *San Telmo* decision did not reach any constitutional claims or federal statutory claims and did not address the validity of the tenant relocation assistance provisions of HPO-2.

After this court's *San Telmo* decision, the city attorney advised the Department to stop enforcement of HPO-2's housing replacement provisions. The Department was advised, however, that it could continue enforcement of HPO-2's remaining tenant relocation assistance provisions.

In December 1987, the King County Superior Court held HPO-2's tenant relocation assistance provisions were an unauthorized tax in violation of RCW 82.02.020, as well as a violation of the Fifth and Fourteenth Amendments, and of article 1, sections 3 and 16 of the Washington Constitution. The court granted R/L Associates an injunction against enforcement of the tenant relocation assistance provisions. The City appealed.

In the interim, the city attorney informed the Department of the superior court decision granting an injunction

to R/L Associates, its heirs and assigns. The Department was advised that since the order was restricted to the parties, the Department must stop enforcement vis-a-vis R/L Associates, but could continue enforcement against nonparties. The City issued a news release stating it would continue enforcement of the tenant relocation assistance provisions of HPO-2 against all but R/L Associates.

In March 1988, R/L Associates obtained a contempt judgment against the City, Holly Miller (the director of the Department), and HPO administrator Ovid Thompson for continued enforcement of the tenant relocation assistance provisions of HPO-2, as it constituted a failure to comply with the permanent injunction awarded R/L Associates. The Department then stopped enforcement of the relocation assistance provisions of HPO-2.

In the City's appeal of the R/L Associates decision, this court held that the tenant relocation assistance provisions of HPO-2 violated RCW 82.02.020, but did not hold HPO-2 to be a tax. *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 780 P.2d 838 (1989). For the City's noncompliance with the superior court injunction against continued enforcement of invalidated HPO provisions, this court upheld the contempt judgment against the City. This court declined to reach the taking issue raised by the plaintiffs in *R/L Assocs.*, and reversed the trial court's ruling that enforcement of HPO-2 violated substantive due process, as the plaintiffs had made "no allegation of irrational, or arbitrary or capricious conduct on the part of the City in its denial of [the] demolition license." *R/L Assocs.*, at 412.

Procedural History

On May 27, 1988, Roy and Kathleen Robinson, on behalf of themselves and the class of persons who paid demolition license fees or tenant relocation assistance pursuant to either HPO-1 or HPO-2, filed this action against the City and four individual employees: William Justen, Beatrice Ryan, and Holly Miller, all successive directors of the Department during the time the HPO was effective; and

Ovid Thompson, the official responsible for the administration of the HPO. The complaint sought compensatory and punitive damages for enforcement of the tenant relocation assistance and housing replacement/fee provisions of HPO-1 and HPO-2, claiming the City "maliciously, recklessly and/or wantonly" violated the constitutional rights of the Robinsons and the class by "willfully" enforcing an unconstitutional ordinance. The class was certified. The individual defendants moved for summary judgment to dismiss the claims against them on the basis of qualified immunity. The Robinsons moved to strike the defendants' qualified immunity defenses and claimed the City was liable for damages under 42 U.S.C. § 1983. The City moved to dismiss the section 1983 claims. On March 30, 1989, the King County Superior Court granted the individual defendants' motion to dismiss the personal liability claims. On May 1, 1989, the court granted the City's cross motion for summary judgment dismissing the section 1983 civil rights claims.

On January 30, 1990, the trial court entered a partial summary judgment order, applying a 3-year statute of limitation, holding the City liable for sums paid by the Robinsons within 3 years of the filing of the lawsuit. The parties stipulated to factual issues remaining for trial and waived jury trial. The City submits it offered to settle this action for $422,761.12 at this time and that this offer was rejected. The Robinsons dispute the timeliness of this offer.

On February 28, 1990, the Superior Court awarded the Robinsons $430,271.47, costs and statutory attorney fees of $125. The court denied Robinsons' renewed motion for attorney fees on March 21, 1990.

This action is an appeal from the February 28, 1990, final judgment and the March 21, 1990, superior court order denying attorney fees. The City cross-appeals the final judgment and the January 30, 1990, summary judgment order holding the City liable for refunds. The appeal of the order dismissing the Robinsons' action against the individual city officials has been consolidated.

ISSUES

The following issues are presented:

FIRST: Did the trial court err when it dismissed the Robinsons' civil rights claims against the City of Seattle?

SECOND: Did the trial court err when it dismissed the plaintiffs' civil rights claim against the individual city officials?

THIRD: Did the trial court err when it awarded a refund for payments made pursuant to the Housing Preservation Ordinance, which has been invalidated? (Cross appeal of City).

FOURTH: If any refunds were proper, did the trial court err when it applied a 3-year statute of limitation to the plaintiffs' claims?

FIFTH: Did the trial court err in denying the attorney fee requests of the Robinsons?

ANALYSIS

This case, as well as that of *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 829 P.2d 765 (1992), involves a claim against the City of Seattle and its officials under 42 U.S.C. § 1983. The gravamen of such a claim is that a person acting under the color of state law has deprived a person of a federal right.

Resolution of the civil rights claims in this appeal requires us to address the much-debated power of government to interfere with the free enjoyment of privately owned property. The commentary on this area indicates this has been a particularly difficult area of law. *See* Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339 (1989); Comment, *Taking Issue With Takings: Has the Washington State Supreme Court Gone Too Far?*, 66 Wash. L. Rev. 545 (1991). This court's recent opinions in *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987) (*Orion* I), *cert. denied*, 486 U.S. 1022 (1988) and *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911 (1990) have formulated a comprehensive state "regulatory takings" doctrine. Thus, this State's current rule on the law of inverse

condemnation has only recently taken shape, and both this case and that of *Sintra, Inc. v. Seattle, supra*, are opportunities for this court to apply recently adopted analysis.

In this case, the Robinsons allege the City's Housing Preservation Ordinance took private property without just compensation, and that enforcement of the Housing Preservation Ordinance violated their substantive due process rights. Since our treatment of the several issues on appeal is dependent upon a determination of whether these federal constitutional rights were violated, we address first the issues of the alleged taking and claimed substantive due process violation. The Robinsons' claims require an analysis of when, under state law, a substantive due process remedy and a takings remedy are available when land use regulations are alleged to be excessive. (This is so because in some instances the availability of relief under state law bears upon the accrual of a federal cause of action.) Our state law inquiry is controlled by this court's decision in *Presbytery of Seattle v. King Cy., supra*. In *Presbytery*, we held the plaintiff had not satisfied exhaustion requirements before bringing an action, and thus this court did not have occasion to apply the test delineated in its decision.

After addressing the contended violations of constitutional rights under the *Presbytery* decision, we will address, in order, the propriety of the trial court's dismissal of the Robinsons' civil rights actions against the City and the individual officials, the refunds of payments to the Robinsons, the applicable limitation period for this type of action, and the claim for attorney fees against the City. Like handling fly paper, it is difficult to put down one piece of this review when picking up the next. Evaluation of one subject in this case impacts another issue that in turn raises another for evaluation and decision. For clarity in this involved opinion, we set forth the areas of law discussed separately, although they are interrelated.

*Presbytery* Analysis

██ Under our state regulatory takings jurisprudence, when a regulation results in a taking, the remedy is just compensation; and when the regulation violates substantive due process, the remedy is invalidation of the regulation. *Presbytery*, 114 Wn.2d at 331-32.[3]

However, we note that although under Washington law the remedy for claims that an ordinance violates substantive due process is invalidation, under certain circumstances a substantive due process claim for damages may still be lodged under federal law in state court through the state court's concurrent jurisdiction in section 1983 cases. *See generally* Bley, *Use of the Civil Rights Acts To Recover Money Damages for the Overregulation of Land*, 14 Urb. Law. 223 (1982); *Regulating the Timing of Development: Takings Clause and Substantive Due Process Challenges to Growth Control Regulations*, 24 Loy. L.A. L. Rev. 1205 (1990-1991); 1 S. Steinglass, *Section 1983 Litigation in State Courts* § 3.4 (Release 5 1990).

A. Threshold Inquiry.

██ Under this court's decision in *Presbytery*, a land use regulation may be challenged either as an unconstitutional taking without just compensation or as a violation of substantive due process. 114 Wn.2d at 329. To determine whether a takings analysis is available, the first step is a threshold inquiry. This inquiry asks first whether the challenged regulation protects the public interest in health, safety, the environment or fiscal integrity. We contrast such police power regulation with a regulation that seeks less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit. *Presbytery*, at 329. Second,

---

[3]For clarity, we analyze these theories of relief separately: "These two constitutional theories are *alternatives* in cases where overly severe land use regulations are alleged. It is critical that these two grounds be separately considered and independently analyzed because the remedies for each of these types of constitutional violation are different." *Presbytery*, at 329.

we ask whether the regulation destroys or derogates any fundamental attribute of ownership: the rights to possess exclusively, to exclude others, and to dispose of property. *Presbytery*, at 329-30. If the regulation does not destroy a fundamental attribute of ownership and does no more than protect the public health, safety, and welfare, then the regulation is not subject to a taking challenge. The challenged regulation is still subject to a substantive due process challenge for reasonableness. However, if the regulation *either* infringes upon a fundamental attribute of property ownership *or* goes beyond mere harm prevention to require a property owner to provide a public benefit, then that regulation is susceptible to a constitutional taking challenge. *Presbytery*, at 333.

B. Takings Analysis.

Once a court determines that a regulation is vulnerable to a taking challenge, it engages in a "taking" inquiry. The court first determines whether the regulation substantially advances legitimate state interests. If the answer to this question is "no", then the regulation is a per se taking. *Presbytery*, at 333. If the regulation does substantially advance legitimate state interests, then the court next determines whether the plaintiff's challenge to the regulation is a facial challenge or an "as applied" challenge. If a plaintiff alleges the application of the regulation to *any* property is a taking, the challenge is a facial one. For facial challenges, no exhaustion of administrative remedies is required. *Presbytery*, at 333. However, if a plaintiff challenges the regulation as it applies to a specific parcel of property, the challenge to the regulation is "as applied". *Presbytery*, at 333. Exhaustion of administrative remedies is generally required for "as applied" challenges. *See Presbytery*, at 337, 338 & n.36; *Estate of Friedman v. Pierce Cy.*, 112 Wn.2d 68, 80, 768 P.2d 462 (1989).

For a facial challenge to succeed, "the landowner must show that the regulation denies all economically viable use of *any parcel* of regulated property in order to constitute a taking." (Italics ours.) *Presbytery*, at 333-34. A

determination that a regulation denies all economically viable use of any given parcel of property "should prove to be a relatively rare occurrence." *Presbytery*, at 335.

In an "as applied" challenge (involving the application of the regulation to specific property), the court considers "(1) the economic impact of the regulation on the property; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the government action." (Footnote omitted.) *Presbytery*, at 335-36. Once a court determines a taking has occurred, just compensation is mandated. *Presbytery*, at 337.

C. Substantive Due Process Analysis.

██ Even if a regulation is not susceptible to a taking challenge because it does not deny a fundamental attribute of property ownership and is purely an exercise of the police power designed to protect the public health, safety and welfare from harm, the regulation is still subject to substantive due process scrutiny for reasonableness. "The inquiry here must be whether the police power (rather than the eminent domain power) has exceeded its constitutional limits." *Presbytery*, at 330. The 3-prong due process test is applied, which inquires: (1) whether the regulation aims to achieve a legitimate public purpose, (2) whether the means adopted are reasonably necessary to achieve that purpose, and (3) whether the regulation is unduly oppressive on the property owner. *Presbytery*, at 330; *see also West Main Assocs. v. Bellevue*, 106 Wn.2d 47, 52, 720 P.2d 782 (1986).

The first and second parts of this test are often easily met by challenged government action. The third part is a more difficult determination. Accordingly, in *Presbytery*, this court adopted the following set of guidelines for the third inquiry for a determination that a regulation was "unduly oppressive":

> The "unduly oppressive" inquiry lodges wide discretion in the court and implies a balancing of the public's interest against those of the regulated landowner. We have suggested several factors for the court to consider to assist it in determining whether a regulation is overly oppressive, namely: the

nature of the harm sought to be avoided; the availability and effectiveness of less drastic protective measures; and the economic loss suffered by the property owner.

*Presbytery*, at 331 (citing *Orion Corp. v. State*, 109 Wn.2d 621, 655 n.24, 747 P.2d 1062 (1987) (*Orion II*), cert. denied, 486 U.S. 1022 (1988). This court also has noted a set of nonexclusive factors for guidance in performing the "unduly oppressive" balancing test:

On the public's side, the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the proposed regulation solves it and the feasibility of less oppressive solutions would all be relevant. On the owner's side, the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation and how feasible it is for the owner to alter present or currently planned uses.

*Presbytery*, at 331 (citing Stoebuck, San Diego Gas: *Problems, Pitfalls and a Better Way*, 25 Wash. U.J. Urb. & Contemp. L. 3, 33 (1983)).

If the regulation fails to meet any of the three prongs of the substantive due process analysis, then it is subject to invalidation. Under *Presbytery*, "[n]o compensation (which properly belongs with a 'taking' analysis) is warranted in the face of a due process violation." *Presbytery*, at 332. We repeat that a violation of a plaintiff's rights to substantive due process (that is, reasonable regulation) may under limited circumstances form the basis for independent *federal* statutory relief through a section 1983 action, which affords a damages remedy. The measure of these damages may differ from the "just compensation" measure.

D. Applying *Presbytery* to This Case.

■ Applying the *Presbytery* analysis to this case, we begin with the threshold analysis, as the plaintiffs contend a taking occurred. The HPO regulated the demolition and removal from the market of housing units by landowners. Enforcement of the HPO did not destroy any fundamental rights of property ownership and did not constitute a permanent invasion of the property. We conclude, however, that

the ordinance did go beyond preventing a harm, and required landowners to provide a public benefit in requiring property owners to pay a fee or replace rental units lost before removing units or demolishing them. We have on an earlier occasion stated that the burden of providing this public benefit was one best borne by the community rather than by individuals:

> [T]he City may not constitutionally pass on the social costs of the development of the downtown Seattle area to current owners of low income housing. The problem must be shared by the entire city, and those who plan to develop their property from low income housing to other uses cannot be penalized by being required to provide more housing.

*San Telmo Assocs. v. Seattle,* 108 Wn.2d 20, 25, 735 P.2d 673 (1987). Having applied the threshold test, we conclude that this case is not beyond a taking challenge. We would distinguish our threshold determination in this case, however, from that which may result when the development of a particular piece of property would cause direct harm to the environment, such as the destruction of an irreplaceable wetland or shoreline ecosystem.

We therefore engage in a takings analysis and thus ask first whether the HPO advanced any legitimate state interests. *Presbytery,* at 333. The City persuasively contends that the housing replacement and tenant assistance provisions were substantially related to preserving low income housing and assisting tenants experiencing relocation hardships. We conclude the ordinance did advance legitimate state interests in the general welfare of the citizens of Seattle in attempting to preserve rental housing stock and assist low income tenants, and therefore was not a per se taking. *Presbytery,* at 333. Since the ordinance did advance legitimate state interests, it is necessary to look further and determine whether the Robinsons' challenge is facial or "as applied". *Presbytery,* at 333.

The Robinsons' complaint contends the HPO was "facially invalid" and constituted a taking of whatever property to which it was applied, and therefore is a facial

challenge. We therefore do not engage in an "as applied" analysis. In the case of a facial challenge, a taking will be found only if the landowner shows the regulation denied all economically viable use of *any* regulated property. *Presbytery*, at 333-34. The Robinsons do not provide adequate basis for such an allegation, nor could they make this "relatively rare" showing, as the record indicates persons successfully developed some properties after paying the HPO license fees. We therefore hold the Robinsons' taking claim fails the *Presbytery* test for determining a challenged regulation is on its face a taking.

However, we may still proceed to analyze the Robinsons' claim that the City deprived them of substantive due process through enforcement of the HPO. The substantive due process analysis affords a different state law remedy and is independently undertaken. *Presbytery*, at 329. Even if a regulation is not a taking, it must nevertheless pass the 3-prong due process test for reasonableness. *Presbytery*, at 330. This court has observed that "many challenges to land use regulations will most appropriately be analyzed under a due process formula rather than under a 'taking' formula." *Presbytery*, at 332-33.

Applying the substantive due process analysis to this case, we ask *first* whether the HPO was aimed at achieving a legitimate public purpose; *second*, whether the means used are reasonably necessary to achieve that purpose; and *third*, whether the HPO was unduly oppressive. *Presbytery*, at 330. The HPO had a legitimate public purpose and employed reasonable means to achieve it; we therefore conclude the HPO satisfies the first two prongs of the due process test for reasonableness. However, as this court has previously noted, "[t]he third inquiry will usually be the difficult and determinative one." *Presbytery*, at 331. In the third inquiry, we ask whether the HPO was unduly oppressive and conclude that it was. We are assisted by the following nonexclusive factors previously adopted by this court in balancing the interests of the City against those of the owners of property regulated by the HPO:

On the public's side, the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the proposed regulation solves it and the feasibility of less oppressive solutions would all be relevant. On the owner's side, the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation and how feasible it is for the owner to alter present or currently planned uses.

*Presbytery*, at 331 (citing Stoebuck, San Diego Gas: *Problems, Pitfalls and a Better Way*, 25 Wash. U.J. Urb. & Contemp. L. 3, 33 (1983)).

We review these nonexclusive factors in balancing the City's interests against the Robinsons. The public problem of homelessness is certainly serious. The extent to which an owner's land or property particularly contributes to a public problem may in certain instances be determinative, such as in some environmental protection cases. However this factor is not particularly crucial in this action because these urban properties already have multiple potential uses. The problems of homelessness and a lack of low income housing in Seattle are in part a function of how all Seattle landowners are using their property. We further conclude that both the feasibility of less harsh means of achieving the City's purpose and the permanence of the nonzoning regulation in controlling the type of use of the landowner's property militate against the City. This court has already said of the HPO that solving the problem of the decrease in affordable rental housing in the city of Seattle is a burden to be shouldered commonly and not imposed on individual property owners. *San Telmo*, 108 Wn.2d at 25. We hold the HPO to be an unduly oppressive, and thus unreasonable, regulation. It therefore violated the rights of the Robinsons to substantive due process under our holding in *Presbytery*, at 331-32.

■ ■ If an ordinance unduly oppresses a property owner and is struck down as violative of due process, then the law of this State provides a remedy of invalidation. *Presbytery*, at 331-32. The ordinance in this case, the HPO, has already been invalidated on other grounds. However, as

a substantive due process violation is a deprivation of a federal constitutional right, the Robinsons may also be entitled to seek a damages remedy under federal statutes. "Along with the vast majority of federal courts, we recognize that denial of a building permit . . . may give rise to a substantive due process claim" under 42 U.S.C. § 1983. *R/L Assocs.*, at 412. The plaintiffs' state law remedies are at this point complemented by the resort to 42 U.S.C. § 1983; federal relief in this instance picks up where state relief leaves off. Property rights, in addition to personal liberties, are within the protection of 42 U.S.C. § 1983. *Gibson v. Seattle (Wash.) Dep't of Police*, 472 F.2d 1220 (9th Cir. 1973). What must be proved by a section 1983 plaintiff may involve more than is necessary for establishing a right to relief under *Presbytery*. In many cases this means that burdens will be more difficult, but also that additional remedies will be available in section 1983 cases.

Before venturing further, we wish to reemphasize that "[m]ere regulation on the use of land has never constituted a 'taking' or a violation of due process under federal or state law." *Presbytery*, at 327. In the exercise of the police power regarding property use, such as in zoning and building permit requirements, government may legitimately impose many types of restrictions or development conditions on a landowner. An inexhaustive sampling of regulations would include building height, setbacks from the street, requirements for streets and access, dedication of easements for the public use, and creation of parks or green space in residential developments, and many environmental regulations. Impositions of these conditions, regulations, or restrictions are not per se violative of substantive due process or the taking clause.

## Section 1983 Remedy

The Robinsons assign error to the trial court's ruling dismissing their section 1983 claims on summary judgment. They argue they are entitled to prevail on their section 1983 claims on the basis of a substantive due process violation

committed by the City. The basis for this section 1983 substantive due process claim is the alleged violation of the plaintiffs' constitutional property rights by the City's unreasonable regulation of land use through enforcement of invalidated ordinance provisions. The Robinsons submit that imposition of an illegal condition on a land use permit, and the violation of a court order, deprived their class of substantive due process.

State courts have concurrent jurisdiction in actions brought under 42 U.S.C. § 1983. *See Lange v. Nature Conservancy, Inc.*, 24 Wn. App. 416, 601 P.2d 963 (1979), *cert. denied*, 449 U.S. 831 (1980); *Martinez v. California*, 444 U.S. 277, 283 n.7, 62 L. Ed. 2d 481, 100 S. Ct. 553 (1980). The trial court in the Robinsons' case dismissed their civil rights claims on summary judgment. The City argues the trial court dismissal should be affirmed, as the Robinsons failed to state a prima facie case for either inverse condemnation or a substantive due process violation.

In considering an appeal from an order of summary judgment, this court engages in the same inquiry as the trial court. *Neubert v. Yakima-Tieton Irrig. Dist.*, 117 Wn.2d 232, 236, 814 P.2d 199 (1991). The reviewing court is to consider all the facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party. *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990). Under CR 56(c), summary judgment is only appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

We accordingly review the Robinsons' action in light of the whole record in determining whether the City was entitled to judgment as a matter of law. The applicable law is 42 U.S.C. § 1983.

A. Basis for Section 1983 Complaint.

42 U.S.C. § 1983 is a remedial statute; it does not create any new substantive rights. Its function is to allow

an avenue of redress to persons injured by the actions of government which violate federal constitutional rights. Section 1983 has been used often as a means of redress when government land use regulation infringes upon federal constitutional or statutory rights through violations of the taking clause or of due process. *See* Bley, *Use of the Civil Rights Acts To Recover Money Damages for the Overregulation of Land*, 14 Urb. Law. 223, 225 n.12 (1982). 42 U.S.C. § 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The main elements of a section 1983 action which a plaintiff must demonstrate to state a cause of action are: (1) a person has deprived the plaintiff of a federal constitutional or statutory right, and (2) that person acted under color of state law. *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989); *Brower v. Wells*, 103 Wn.2d 96, 104-05, 690 P.2d 1144 (1984). A municipality may be a "person" for purposes of section 1983. *Monell v. Department of Social Servs.*, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).

A municipality may be subject to suit under section 1983 of the federal civil rights statutes when that municipality acts through an ordinance. *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 780 P.2d 838 (1989). In addition, a municipality may be liable on a section 1983 civil rights claim when a city employee violates a federally protected right while executing a policy or ordinance officially adopted and implemented by city officials. *Learned v. Bellevue*, 860 F.2d 928 (9th Cir. 1988), *cert. denied*, 489 U.S. 1079 (1989). The plaintiffs in this case sued the City of Seattle, which may be recognized as a "person" under section 1983, as well as bringing action against several city employees in both their official and individual capacities. The Robinsons

alleged a violation of their federal constitutional rights was committed by the City and its employees acting pursuant to an ordinance (the HPO); and a municipality may be subject to section 1983 liability when it acts through an ordinance. *R/L Assocs.*, at 411-12.

We reject the City's contention that this court in *R/L Assocs.* held as a matter of law that Seattle's enforcement of the HPO could not give rise to a civil rights claim. As the Robinsons point out, this court simply did not consider that issue on appeal:

> While R/L pleaded a section 1983 claim, it made no allegation of irrational, or arbitrary or capricious conduct on the part of the City in its denial of R/L's demolition license. Moreover, this issue was not presented to or considered by the trial court, and will not be considered on appeal.

*R/L Assocs., Inc. v. Seattle*, at 412. The city action at issue in *R/L Assocs.* was the imposition of the HPO's tenant relocation assistance requirement upon the landowner prior to the time that particular provision of the HPO was declared facially invalid by the King County Superior Court. The Robinsons submit that by contrast, in their case they *do* plead arbitrary and capricious conduct, and that this case involves the enforcement of HPO provisions even *after* the time of the superior court decree ruling the provisions invalid. According to the Robinsons, the "strongest" evidence of irrationality in city action is the enforcement of the HPO *after* trial courts had held it invalid and enjoined further enforcement; *e.g.*, in one instance, a trial court ruling was followed by a press conference to the effect that the City would continue enforcement of the HPO against all but the successful plaintiffs in the action. *See R/L Assocs.*, at 411.

The City did continue enforcement of the HPO's various provisions after trial court declarations of invalidity. In *San Telmo Assocs. v. Seattle*, 108 Wn.2d 20, 735 P.2d 673 (1987), this court affirmed a superior court ruling of invalidity, holding the HPO invalid as an unauthorized tax or fee on the development of land prohibited by RCW 82.02.020. *San*

*Telmo*, at 23-24. Later, this court in *R/L Assocs.* held the tenant relocation assistance provisions of the HPO also invalid. *R/L Assocs.*, at 411. This court went further, upholding the contempt ruling of the Superior Court entered against the City's officers for their continued enforcement of the tenant relocation assistance provisions after the provisions were ruled invalid. *R/L Assocs.*, at 411. In our opinion, we expressly rejected an argument by the City that a Superior Court's ruling of invalidity was binding on the City only as against the plaintiff to the action:

> [T]he City's argument would lead to the absurd conclusion that it is free to enforce the provisions of a facially invalid ordinance against the citizens of Seattle until and unless each aggrieved party brings its own action challenging the ordinance. This would lead to multiple and unnecessary litigation upon an issue in which the City has clearly been denied authority to proceed.

*R/L Assocs.*, at 411. We went on to instruct the City further:

> The City observes that an injunction does not determine the rights and interests of persons who are not joined as parties. We agree. However, the City overlooks the fact that *it* is a party, and CR 65(d) provides that an order granting an injunction is binding *upon* the parties to the action and their officers and agents.

*R/L Assocs.*, at 411. Finally, in affirming the order of contempt, we observed:

> The City's decision to continue to enforce the HPO was deliberate. Two days after issuance of the injunction in this case, the City issued a news release that the city attorney had advised the Department of Construction and Land Use to continue to enforce the tenant relocation requirements. The release stated that the City had been enjoined from enforcing this provision in one case. The courts need not tolerate this intentional violation of a valid judgment that prohibited the City from enforcing those provisions.

*R/L Assocs.*, at 411.

B. Civil Rights Claim Against City Valid.

 A city cannot be held liable in damages for the mere enforcement of an unconstitutional or void ordinance in the nature of a police power regulation. *R/L Assocs.*, at 412. A land use decision denying substantive due process

states a cause of action under section 1983 only if it is invidious or irrational, *see R/L Assocs.*, at 412, or arbitrary, *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988). However, in this case we conclude that the Robinsons state a proper claim for violation of substantive due process under section 1983, and further that genuine issues of material fact remain. Therefore, the Robinsons' action should be allowed to proceed to trial for a decision on the facts. We so hold not merely because the City enforced an invalid or unconstitutional ordinance, but because the City *continued* to enforce ordinance provisions after they had been declared on separate, respective occasions to be invalid by trial courts.

We first consider whether the Robinsons adequately plead a violation of substantive due process for the purposes of section 1983. To successfully challenge a governmental action or regulation in a section 1983 action on substantive due process grounds, the plaintiff must plead and prove that the challenged government action is wholly arbitrary and capricious or irrational, or utterly fails to serve a legitimate purpose. *See Regulating the Timing of Development: Takings Clause and Substantive Due Process Challenges to Growth Control Regulations*, 24 Loy. L.A. L. Rev. 1205, 1225 (1990-1991) (citing *Nelson v. Selma*, 881 F.2d 836, 839 (9th Cir. 1989); *Greenbriar, Ltd. v. Alabaster*, 881 F.2d 1570, 1577 (11th Cir. 1989); *Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1034-35 (3d Cir.), *cert. denied*, 482 U.S. 906, *reh'g denied*, 483 U.S. 1040 (1987)). The Robinsons' allegation in the complaint that "Defendants have maliciously, recklessly, and/or wantonly" violated constitutional rights is sufficient to plead either "irrational or invidious" or "arbitrary and capricious" conduct as required.

A substantive due process claim does not require proof that all use of one's property has been denied. *Herrington v. County of Sonoma*, 834 F.2d 1488, 1498 (9th Cir. 1987). Rather, the plaintiff must show that the interference with property rights was irrational or arbitrary. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 49 L. Ed. 2d 752, 96 S.

Ct. 2882 (1976). Where a plaintiff seeking section 1983 relief alleges that a municipality's land use authorities violated plaintiff's rights to substantive due process, the plaintiff bears the burden of demonstrating that the governmental action was arbitrary, irrational, or tainted by improper motive. *De Botton v. Marple Township.*, 689 F. Supp. 477, 481 (E.D. Pa. 1988). The plaintiff's complaint must allege facts that would support a finding of irrational or arbitrary action. *De Botton*, at 481 (citing *Pace Resources, Inc. v. Shrewsbury Township, supra*).

In *Pace Resources*, the court upheld the denial of the defendant's motion to dismiss the plaintiff's substantive due process claims since the plaintiff alleged facts from which a jury could conclude the municipality acted in an arbitrary or irrational manner in land use decisions. The court noted that although the town claimed its actions were taken in an entirely reasonable manner, this was a question that could be addressed at trial. *De Botton*, at 481.

 Property owners may also raise due process claims without first seeking just compensation through state court remedies. *Sinaloa Lk. Owners Ass'n v. Simi Vly.*, 882 F.2d 1398, 1404-05 (9th Cir. 1989) (amended opinion), *cert. denied sub nom. Doody v. Sinaloa Lk. Owners Ass'n, Inc.*, 494 U.S. 1016, 108 L. Ed. 2d 493, 110 S. Ct. 1317 (1990). A plaintiff is not required to seek compensation from a state entity before bringing a substantive due process claim because substantive due process is violated at the moment harm occurs; thus, the existence of postdeprivation state remedies does not bar a section 1983 action. *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988) (citing *Rutherford v. Berkeley*, 780 F.2d 1444, 1447 (9th Cir. 1986)). In *Bateson*, the Ninth Circuit affirmed a district court finding that the Billings, Montana, city council's refusal to issue a building permit to the plaintiff after he had satisfied all permit requirements was an arbitrary and capricious act which denied Bateson substantive due process. The City points to distinctions between this case and *Bateson*, such

as the fact that in *Bateson* the city council acted *contrary* to the advice of counsel and singled out one individual for its conduct.

Because a finder of fact could determine the City acted arbitrarily and capriciously in repeatedly continuing enforcement of the HPO, rather than seeking to stay the force or effect of rulings of invalidity and injunctions against enforcement, genuine issues of material fact remain to be determined. CR 56(c). This determination is for the finder of fact after hearing testimony and receiving evidence.

We hold the Robinsons properly stated a cause of action under 42 U.S.C. § 1983, having alleged their constitutional rights (to substantive due process) were violated by "persons" (the City of Seattle and its officials) acting under color of law (the Housing Preservation Ordinance). Their claim is based in an impairment of constitutional property rights caused by the City of Seattle's unreasonable, continued enforcement of a land use regulation previously invalidated by a trial court. As genuine issues of material fact remain to be decided, the trial court erred in dismissing the Robinsons' civil rights action against the City on summary judgment. The liability of the City to the Robinsons under section 1983, and to what degree possible civil rights damages are available, are matters to be determined in trial court.

### Qualified Immunity

In the Robinsons' consolidated action from the Court of Appeals, they challenge the dismissal of their 42 U.S.C. § 1983 claims against the individual city officials who were also defendants in their personal capacities in the original suit. The officials being pursued in their individual capacities by the Robinsons are: William Justen, Holly Miller, and Beatrice Ryan, successive directors of the Department of Construction and Land Use; and Ovid Thompson, an officer responsible for enforcement of the HPO. The Robinsons contend the officials are not proper candidates for qualified immunity from liability, arguing that under *Harlow v. Fitz-*

*gerald*, 457 U.S. 800, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982), the officials violated "clearly established rights" of which a reasonable person would have known.

The City contends that William Justen, Holly Miller, Beatrice Ryan and Ovid Thompson are entitled to qualified immunity because these officials enforced the HPO on the advice of counsel at a time when the land use doctrines on regulatory takings and substantive due process violations were in a state of change and uncertainty, with the rights of the Robinsons being not "clearly established". The City submits that the validity of the HPO was an issue on the cutting edge of land use regulatory law in the United States during the time the superior court rulings invalidating the HPO were entered. As support for this argument, the City cites several cases indicating that other jurisdictions have upheld police power regulations restricting the removal of rental units from the market in order to maintain a low income rental housing base in a city or restricting a landowner's rights to demolish property. *See Terminal Plaza Corp. v. City & Cy. of San Francisco*, 177 Cal. App. 3d 892, 223 Cal. Rptr. 379 (1986); *Help Hoboken Housing v. Hoboken, N.J.*, 650 F. Supp. 793 (D.N.J. 1986); *Nash v. Santa Monica*, 37 Cal. 3d 97, 688 P.2d 894, 207 Cal. Rptr. 285 (1984), *appeal dismissed*, 470 U.S. 1046 (1985); *Grace v. Brookline*, 379 Mass. 43, 399 N.E.2d 1038 (1979).

▮ Local government entities are not entitled to the qualified immunity available to their officials. *Owen v. Independence, Mo.*, 445 U.S. 622, 63 L. Ed. 2d 673, 100 S. Ct. 1398 (1980). Further, in contrast to the rule in section 1983 actions against municipalities, or against municipal officers sued in their official capacities, plaintiffs who bring *personal capacity* suits against officials need not establish a connection to governmental "policy or custom" in the defendant's actions. *Hafer v. Melo*, ___ U.S. ___ , 116 L. Ed. 2d 301, 112 S. Ct. 358, 361-62 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985)). Government officials performing discretionary functions, however, cannot be held personally liable for

damages under section 1983 of the federal civil rights statute unless their conduct violates clearly established federal constitutional or statutory rights; such persons are entitled to qualified immunity from a claim under section 1983 if their conduct is objectively reasonable when measured against clearly established law. *Thorsted v. Kelly*, 858 F.2d 571 (9th Cir. 1988); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). Qualified immunity from suit must be granted when the law or right allegedly violated is not clearly established. *Conner v. Santa Ana*, 897 F.2d 1487, 1492 (9th Cir. 1990).

Qualified immunity protects government officials from insubstantial suits and harassing litigation while at the same time not foreclosing suits for damages which may be the only realistic avenue for the vindication of constitutional rights of the plaintiff. *Harlow v. Fitzgerald*, *supra* at 814. The standard for an official seeking the shield of the qualified immunity defense is an objective, and not a subjective, standard. *Anderson v. Creighton*, 483 U.S. 635, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). It is no defense to a section 1983 action that a defendant had no specific intent to cause a deprivation of civil rights. *United Steelworkers v. Milstead*, 705 F. Supp. 1426, 1436 (D. Ariz. 1988); *Gomez v. Toledo*, 446 U.S. 635, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980).

 Since qualified immunity entitles government officials to "an *immunity from suit* rather than a mere defense to liability" under *Mitchell v. Forsyth*, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985), it is critical that insubstantial claims be resolved as quickly as possible. *Thorsted*, 858 F.2d at 575 (citing *Anderson v. Creighton*, 483 U.S. at 640 n.2). Thus, when available, the defendant's entitlement to qualified immunity may be established as a matter of law on a motion for summary judgment or for a directed verdict.

 Once the affirmative defense of qualified immunity has been raised in a case on a defendant's motion for summary judgment, the *plaintiff* bears the burden of demonstrating the existence of the allegedly "clearly established"

constitutional right. *See Mitchell v. Forsyth*, 472 U.S. at 526:

> Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. . . . Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.

Regarding the "clearly established" standard, the Supreme Court has indicated that a certain degree of predictability is required:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. at 640. *See Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 25, 829 P.2d 765 (1992). The City has pointed to cases in other jurisdictions upholding the constitutional validity of ordinances which the City convincingly argues are similar to the HPO in intent and effect. We are therefore persuaded that it was not "clearly established" when HPO-1 and HPO-2 were enacted that these regulations would violate substantive due process or other federal constitutional or statutory rights of persons owning the regulated property. Thus, while we have concluded that the ordinance in question violated substantive due process under *Presbytery*, this holding does not by itself lead to the conclusion that a section 1983 claim may proceed against the individual defendants. Rather, the substantive due process violation underlying this section 1983 action is the enforcement of HPO provisions *after* they were declared invalid on separate occasions. Therefore, we focus our inquiry on the question of whether enforcement of HPO provisions by city officials *after* such provisions had been declared invalid would violate "clearly established" rights.

 In the absence of binding precedent as to whether the conduct of officials violated clearly established statutory or constitutional rights of which a reasonable person would have known, a court should look to whatever decisional law is available to ascertain whether the law is "clearly established". *Capoeman v. Reed*, 754 F.2d 1512 (9th Cir. 1985).

There existed, at the time of the HPO enforcement, authority in our federal circuit denying immunity of any kind to officials who violate an order of a duly appointed administrative body, let alone a court of law, when the result of this violation implicated federal constitutional rights. In *Donovan v. Reinbold*, 433 F.2d 738 (9th Cir. 1970), a case predating *Harlow*, officials disobeyed an administrative order directing reinstatement of an employee who had been discharged in violation of his First Amendment rights. The court reasoned that the administrative order was like a court order and said: " 'Obviously no immunity should be granted to the officials who wilfully disobeyed an order of court.' " *Donovan*, at 744 (quoting *Hoffman v. Halden*, 268 F.2d 280, 300 (9th Cir. 1959)).

 In general, the shield of qualified immunity does not extend to those officials who knowingly violate the law. *Mills v. Graves*, 930 F.2d 729 (9th Cir. 1991). Here, it is acknowledged by the City that "it may be clearly established that a knowing violation of a court order or administrative regulation violates substantive due process". Consolidated Appeal Brief of Respondents, at 39 (citing *Donovan v. Reinbold*, *supra*). The City, however, contends that while officials Miller and Thompson were held in contempt for violating a court order, this does not establish a *knowing* violation, since only an intentional, deliberate action which violates a court order is required for a finding of contempt, and knowledge that one is committing a violation is not required. *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 410-11, 780 P.2d 838 (1989). We do not deny qualified immunity to Miller and Thompson simply because they were found in contempt. The record in this case indicates all the individual defendants possessed actual knowledge of court rulings invalidating the

HPO and yet continued enforcement. By so doing, these officials exposed the City of Seattle and themselves to liability for unreasonable enforcement of land use regulations in violation of the plaintiffs' constitutional property rights.

The individual defendants maintain, however, that they only followed advice of the city attorneys. We note the Supreme Court has recently held that in the context of section 1983 actions prosecutors are not entitled to absolute immunity for legal advice given to police officers and has indicated that the *Harlow* objective standard applies to police conduct *without reference* to legal advice rendered by the prosecuting attorney:

> Although the absence of absolute immunity for the act of giving legal advice may cause prosecutors to consider their advice more carefully, " '[w]here an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate.' " . . . (quoting *Harlow*, 457 U.S., at 819, 102 S.Ct., at 2738). Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. Cf. *Butz [v. Economou,]* 438 U.S. [478], at 505-506, [57 L. Ed. 2d 895,] 98 S.Ct. [2894 (1978)]. Ironically, it would mean that the police, who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not.

*Burns v. Reed,* ___ U.S. ___, 114 L. Ed. 2d 547, 111 S. Ct. 1934, 1944 (1991).[4] It was suggested in *Donovan* that even the city attorney who advises disregard of a court order would also be liable rather than immune from suit. 433 F.2d at 744.

In this case, the individual defendants, while officials of the City, continued to enforce provisions of the HPO after

---

[4]In contrast the prosecutor's participation in a probable cause hearing in *Burns* was held absolutely immune. *Burns*, 111 S. Ct. at 1942. The distinction is based on the function the prosecutor performs.

> [P]rosecutors are absolutely immune from liability under § 1983 for their conduct in "initiating a prosecution and in presenting the State's case," . . . [*Imbler v. Pachtman*, 424 U.S. 409, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976)] 96 S.Ct., at 995, insofar as that conduct is "intimately associated with the judicial phase of the criminal process," . . . 96 S.Ct., at 995.

*Burns*, 111 S. Ct. at 1939.

such provisions had been declared invalid by a court of competent jurisdiction. The record indicates that all of the individual defendants possessed actual knowledge of the superior court rulings invalidating the HPO. We find no basis for extending qualified immunity to the individual defendants in this case in the contention that they were acting pursuant to the advice of city attorneys in continuing to enforce the HPO provisions in spite of the superior court decisions. The city officials may very well have had the public welfare in mind in continuing enforcement of judicially invalidated HPO provisions, but intentional violations of court orders cannot be tolerated. At least one official stated in a deposition that it was his responsibility to continue enforcement of the HPO provisions even if he believed the ordinance to be unconstitutional. Regardless of an individual official's beliefs, a court's rulings which invalidate an ordinance and order a City to stop enforcement are to be obeyed. Respect for the rule of law is central to due process.

The trial court in this case erred in extending the shield of qualified immunity to the individual city officials for their enforcement of HPO provisions after respective provisions had been declared facially invalid by courts of competent jurisdiction and injunctions against continued enforcement had been entered.[5] Although we decline to extend qualified immunity to the individual defendants, the ultimate issue of their liability under section 1983 is a question which remains to be determined by the finder of fact.

We distinguish for elucidation the case of *Walnut Properties, Inc. v. Whittier*, 861 F.2d 1102 (9th Cir. 1988), *cert. denied*, 490 U.S. 1006 (1989). In *Walnut Properties*, a city attorney and city planning director were sued by an adult theater after they recommended *reenactment* of the City's adult business zoning ordinance which had previously been

---

[5]We note that another court has declined to extend qualified immunity to section 1983 defendants by holding that disobedience of a court order was not a discretionary act entitled to immunity. *See Front Royal & Warren Cy. Indus. Park Corp. v. Front Royal, Va.*, 708 F. Supp. 1477 (W.D. Va. 1989).

ruled unconstitutional. While a prior district court opinion had ruled the earlier ordinance unconstitutional, a lack of circuit precedent on point demonstrated that the reenactment of the ordinance was not clearly established to be in violation of the plaintiff's rights, *when that reenactment followed a new counsel study with special findings which had been prepared.* Thus the city attorney and city planning director were held entitled to qualified immunity in that case. Since the City of Whittier had to reenact the ordinance in question, this indicates that contrary to the facts in the present case, the Whittier officials first *withdrew* their challenged ordinance from enforcement before advising the reenactment. Unlike the *Walnut Properties* case, the HPO provisions struck down by trial courts in this case were never withdrawn until this court spoke, not even during the time of the ordinance's redrafting after the first superior court declaration of invalidity in King County cause 83-2-06176-8 (Oct. 13, 1983). Nor did the City in this case seem to acknowledge the authority of the trial court by asking for a stay.

The longstanding rule for section 1983 actions in the Ninth Circuit is that an official who acts in knowing violation of an order of court is not entitled to qualified immunity when these same acts contribute to the basis of the plaintiff's section 1983 claim. The defendants in this case had actual notice of the court rulings of HPO invalidity. We therefore reverse the trial court grant of qualified immunity to the individual defendants and remand with instructions to reinstate those section 1983 substantive due process claims against individual defendants which are not time barred by the applicable statute of limitation discussed below.

We emphasize in this case the presence of *injunctive relief* precluding enforcement, as well as declarations of invalidity, and not merely an adverse ruling against the City. The City neither sought a stay nor appealed these rulings but instead chose to continue enforcement in the face of court orders to the contrary.

VALIDITY OF REFUNDS OF HPO PAYMENTS

While the City submits that refunds of HPO payments were correctly restricted by the trial court to a 3-year statute of limitation period, the City alternatively argues on cross appeal that the trial court erred in refunding any moneys paid by the Robinsons prior to this court's decisions in *San Telmo Assocs. v. Seattle*, 108 Wn.2d 20, 735 P.2d 673 (1987) and *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 780 P.2d 838 (1989).

A. Retroactive vs. Prospective Application.

The City contends the refunds the trial court awarded were based upon an improper retroactive application of the *San Telmo* and *R/L Assocs.* decisions which invalidated the HPO. To apply an appellate decision "retroactively" means to apply its holding to causes of action which arose prior to the announcement of the decision. Retroactive application of the *San Telmo* and *R/L Assocs.* decisions, the City submits, would be contrary to this court's decision in *National Can Corp. v. Department of Rev.*, 109 Wn.2d 878, 749 P.2d 1286, *appeal dismissed, cert. denied*, 486 U.S. 1040 (1988).[6] The Robinsons argue that, to the contrary, the criteria stated by this court in *National Can* favor the trial court's award of refunds to the plaintiffs in this class action.

In *National Can*, this court held the invalidation of a statutory taxing scheme does not automatically entitle a taxpayer to a refund. Before an HPO refund is allowed in

---

[6]*National Can* dealt with the appropriateness of refunds of money collected pursuant to taxes invalidated on constitutional grounds. The United States Supreme Court had held Washington's multiple activities exemption to the state business and occupation tax discriminated against interstate commerce in violation of the commerce clause; and after vacating this court's decisions in *Tyler Pipe Indus., Inc. v. Department of Rev.*, 105 Wn.2d 318, 715 P.2d 123 (1986) and *National Can Corp. v. Department of Rev.*, 105 Wn.2d 327, 732 P.2d 134 (1986), *vacated*, 483 U.S. 232, 97 L. Ed. 2d 199, 107 S. Ct. 2810 (1987), remanded for a decision of the refund issues raised by the federal ruling:

The decisive issues before this court are whether state law mandates refunds, and if not, whether this is an appropriate case for prospective application. We hold state law does not require refunds, and prospective application is appropriate.

*National Can*, 109 Wn.2d at 880.

this case, the City submits that under *National Can* this court must determine whether a refund (requiring retroactive application of the cases invalidating the HPO to the Robinsons' claims) is equitable. "Since Washington law does not foreclose an inquiry into prospective application, we turn to the factors enunciated by the United States Supreme Court to determine whether prospective application is to be afforded in this case." *National Can*, at 881. In making this analysis, the court in *National Can* utilized the following 3-factor approach:

> (1) determine whether the decision establishes a new principle of law either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect and whether retrospective operation will further or retard its operation; and (3) weigh the inequity imposed by retroactive application.

*National Can*, at 881 (citing *Chevron Oil Co. v. Huson*, 404 U.S. 97, 30 L. Ed. 2d 296, 92 S. Ct. 349 (1971)).

The City contends, citing the *Chevron Oil* analysis upon which *National Can* rests, that this case calls for prospective application of both the *San Telmo* and *R/L Assocs.* decisions. This is because those decisions established a new principle of law, and (1) this new principle was not clearly foreshadowed, (2) this new principle would not further the purposes of those two cases to apply their rules retrospectively, and (3) retroactive application of this new principle would be inequitable.

The Robinsons claim to the contrary that even if applicable, *National Can*'s analysis under the *Chevron Oil* rule favors retroactive application. The Robinsons argue they are entitled to refunds of payments made pursuant to the HPO, as neither their case nor the *San Telmo* or *R/L Assocs.* decisions involved the overruling of clear past precedent. As to purpose, they add that neither the *San Telmo* nor the *R/L*

*Assocs.* decisions limited recovery of fees to prospective application only, unlike the decision in *National Can.* The Robinsons finally argue they would be entitled to refunds even in the absence of the holdings of *San Telmo* and *R/L Assocs.*, as their suit relied on preexisting law, and note that their suit was filed before this court's decision in *R/L Assocs.*

Both parties to this action agree that the *Chevron Oil Co. v. Huson, supra,* analysis relied upon in *National Can* is relevant to our determination of whether the rules of our *San Telmo* and *R/L Assocs.* decisions should be applied retroactively. However, the United States Supreme Court has recently limited the *Chevron Oil Co. v. Huson, supra,* rule regarding retroactive application in the case of *James B. Beam Distilling Co. v. Georgia,* ___ U.S. ___, 115 L. Ed. 2d 481, 111 S. Ct. 2439 (1991).

B. *Beam Distilling* Rule.

*Beam Distilling* dealt with a challenge to a pre-1985 Georgia law imposing an excise tax on imported liquor at a rate double the rate imposed on liquor manufactured from Georgia-grown products. After the United States Supreme Court struck down a similar Hawaii law as violative of the commerce clause in *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 82 L. Ed. 2d 200, 104 S. Ct. 3049 (1984), the *Beam Distilling* petitioner, a Kentucky bourbon manufacturer, then filed suit in Georgia state court seeking a refund of taxes it had paid under the Georgia law in 1982, 1983, and 1984. The Georgia trial court declared the Georgia statute unconstitutional, but refused to apply its ruling retroactively; and thus it would not allow a refund of taxes paid by the Kentucky bourbon manufacturer for 1982, 1983, and 1984. As support for this ruling, the trial court cited the rule of *Chevron Oil Co. v. Huson, supra,* that a decision will be applied prospectively when that decision displaces a principle of law on which the defendant may reasonably have relied, when retroactivity does not further the objectives of the new rule, and when the equities favor prospec-

tive application. The State Supreme Court in Georgia affirmed the decision of the trial court. However, the United States Supreme Court reversed that decision and in a plurality held in favor of retroactive application of the *Bacchus* decision to the parties in *Beam Distilling*. 115 L. Ed. 2d at 491.

Justice Souter delivered the opinion of the court in *Beam Distilling*. It states that the question of whether a newly announced rule of an appellate decision should apply retroactively is a choice of law question for which there are three possible answers. The first possible choice of law approach is to apply a new rule *completely retroactively*:

> First, a decision may be made *fully retroactive*, applying both to the parties before the court and to all others by and against whom claims may be pressed, consistent with res judicata and procedural barriers such as statutes of limitations. *This practice is overwhelmingly the norm* . . . and is in keeping with the traditional function of the courts to decide cases before them based upon their best current understanding of the law.

(Italics ours.) *Beam Distilling*, 115 L. Ed. 2d at 488. The second choice of law approach is to apply the new rule *completely prospectively*:

> Second, there is the *purely prospective method* of overruling, under which a new rule is applied neither to the parties in the law-making decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision. The case is decided under the old law but becomes a vehicle for announcing the new, effective with respect to all conduct occurring after the date of that decision. *This Court has, albeit infrequently, resorted to pure prospectivity . . .* although in so doing it has never been required to distinguish the remedial from the choice-of-law aspect of its decision. . . . This approach claims justification in its appreciation that "[t]he past cannot always be erased by a new judicial declaration," . . . and that to apply the new rule to parties who relied on the old would offend basic notions of justice and fairness. But this equitable method has its own drawback: it tends to relax the force of precedent, by minimizing the costs of overruling, and thereby allows the courts to act with a freedom comparable to that of legislatures.

(Italics ours.) *Beam Distilling*, 115 L. Ed. 2d at 488-89. The third choice of law approach, "*selective prospectivity*", involves applying the new rule to the parties in the case announcing

the new rule, but otherwise to apply the new rule prospectively:

> Finally, a court may apply a new rule in the case in which it is pronounced, then return to the old one with respect to all others arising on facts predating the pronouncement. *This method, which we may call modified, or selective, prospectivity,* enjoyed its temporary ascendancy in the criminal law during a period in which the Court formulated new rules, prophylactic or otherwise, to insure protection of the rights of the accused. . . .
>
> But selective prospectivity also breaches the principle that litigants in similar situations should be treated the same, a fundamental component of stare decisis and the rule of law generally. . . . For this reason, we abandoned the possibility of selective prospectivity in the criminal context in Griffith v. Kentucky, 479 US 314, 328, 93 L Ed 2d 649, 107 S Ct 708 (1987), even where the new rule constituted a "clear break" with previous law, in favor of completely retroactive application of all decisions to cases pending on direct review. Though Griffith was held not to dispose of the matter of civil retroactivity, see id., at 322, n 8, 93 L Ed 2d 649, 107 S Ct 708, *selective prospectivity appears never to have been endorsed in the civil context.*

(Citations omitted. Italics ours.) *Beam Distilling,* 115 L. Ed. 2d at 489-90.

After reviewing the three approaches to the choice of law question, Justice Souter frames *Beam Distilling* as presenting one issue: whether the selective prospectivity approach, no longer available in the criminal context, is available in the civil cases. *Beam Distilling,* 115 L. Ed. 2d at 490. The plurality in *Beam Distilling* holds that selective prospectivity is not available in the civil context. The opinion concludes that *once the Supreme Court has applied a rule of law to the litigants in one case, it must do so with respect to all others not barred by procedural requirements or res judicata*: "Thus, the question is whether it is error to refuse to apply a rule of federal law retroactively after the case announcing the rule has already done so. We hold that it is, principles of equality and stare decisis here prevailing over any claim based on a Chevron Oil analysis."[7] *Beam Distilling,* 115 L. Ed. 2d at 491.

---

[7]Justice Stevens joined in Justice Souter's opinion. Justice White concurred in the judgment, but reasserted the validity of the "pure prospectivity" approach

Thus, the Supreme Court in *Beam Distilling* held that since its decision in *Bacchus* did not reserve the question of retroactive application and remanded the case for consideration of remedial and refund issues, the Supreme Court was itself later barred from denying retroactive application of the *Bacchus* rule to other subsequent litigants whose causes of action also arose prior to the *Bacchus* decision. This was held in spite of the fact that, by all accounts, the *Bacchus* decision clearly overruled existing past precedent.

*Beam Distilling*'s limitation on *Chevron Oil* is not implied, but express:

> To this extent, our decision here does limit the possible applications of the Chevron Oil analysis, however irrelevant Chevron Oil may otherwise be to this case. Because the rejection of modified prospectivity precludes retroactive application of a new rule to some litigants when it is not applied to others, the Chevron Oil test cannot determine the choice of law by relying on the equities of the particular case. . . . *Once retroactive application is chosen for any assertedly new rule, it is chosen for all others who might seek its prospective application.* The applicability of rules of law are not to be switched on and off according to individual hardship; allowing relitigation of choice-of-law issues would only compound the challenge to the stabilizing purpose of precedent posed in the first instance by the very development of "new" rules.

(Italics ours.) *Beam Distilling*, 115 L. Ed. 2d at 493. The *Beam Distilling* decision has effected a limitation on the *Chevron Oil* analysis, which both parties in this case have argued must be considered to the extent it was relied on in our *National Can* decision.

---

he argued was called into question by Justice Souter's opinion. 115 L. Ed. 2d at 494-95. Justices Blackmun, Marshall and Scalia concurred in the judgment, but favored abandonment of *any* prospectivity approach on constitutional grounds: "Unlike a legislature, we do not promulgate new rules to 'be applied prospectively only,' . . . We fulfill our judicial responsibility by requiring retroactive application of each new rule we announce. . . . [P]rospectivity, whether 'selective' or 'pure,' breaches our obligation to discharge our constitutional function." 115 L. Ed. 2d at 496 (Blackmun, J., concurring). Justice O'Connor, joined by Chief Justice Rehnquist and Justice Kennedy, dissented.

To state it another way, under *Beam Distilling*, *retroactive application of a principle in a case announcing a new rule precludes prospective application of the rule in any subsequently raised suit based upon the new rule*. Such selective, or "modified", prospectivity would be unequal and unmindful of stare decisis as it treats similarly situated litigants unequally.[8] *Beam Distilling*, 115 L. Ed. 2d at 493. We are persuaded that the *Beam Distilling* holding is sound. While our decision in *National Can* relied in part on the *Chevron Oil* analysis, we now modify our rule from *National Can* in a manner consistent with the limitations on the *Chevron Oil* rule effected in *Beam Distilling*. We expressly limit our holding in this case to the abolishment of selective prospectivity in the application of our state appellate decisions.

C. Applying *Beam Distilling* to This Case.

In accordance with *Beam Distilling*, as we have noted, once this court has applied a rule retroactively to the parties in the case announcing a new rule, we will apply the new rule to all others not barred by procedural requirements, such as the statute of limitation or res judicata. We begin by recognizing that our decisions in *San Telmo* and *R/L Assocs.* have established, while invalidating HPO provisions, that the plaintiffs in those cases were entitled to the benefit of those holdings. In *R/L Assocs. v. Seattle*, 113 Wn.2d 402, 780

---

[8]In announcing the decision of the court, Justice Souter's opinion states: "We do not speculate as to the bounds or propriety of pure prospectivity", thus reserving the Court's opinion as to the validity of dispositions in which the Court in making a new rule does not apply it to the litigants in the case announcing the new rule. 115 L. Ed. 2d at 493. But apparently the *Beam Distilling* decision has called into question the viability of *any* rules of prospective application under *Chevron Oil Co. v. Huson, supra*:

Justice Souter purports to have restricted the application of Chevron Oil only to a limited extent. The effects appear to me far greater. . . . The inquiry the Court summarized in Chevron Oil represents longstanding doctrine on the application of nonretroactivity to civil cases. Justice Souter today ignores this well-established precedent, and seriously curtails the Chevron Oil inquiry.

(Citations omitted.) 115 L. Ed. 2d at 499 (O'Connor, J., dissenting).

P.2d 838 (1989), this court stated: "Because we hold the tenant assistance provisions invalid, R/L is entitled to a refund of the fees already paid to comply with the provisions." 113 Wn.2d at 411. Similarly, the plaintiffs in *San Telmo* were relieved of the requirement of building replacement housing or paying housing replacement fees. The City incorrectly argues the refund in *R/L Assocs.* was not retroactive, as the plaintiff R/L Associates had challenged the fee and only paid into the court's registry to continue its court action. 113 Wn.2d at 405. However, in *National Can*, this court stated: "Whether the taxes had been collected or still remained to be collected is not relevant to the issue of retroactive application."[9] *National Can*, 109 Wn.2d at 891.

We have observed that this court's *San Telmo* and *R/L Assocs.* decisions were applied to the parties in those actions. The City argues that the *San Telmo* and *R/L Assocs.* decisions should not be applied to cases arising on facts predating the pronouncement of those decisions, even though those decisions were applied to the parties in those cases. We may conclude then that the City is asking for this court to apply those decisions in a selectively prospective manner, an approach we decline to follow.

---

[9]This rule for defining retroactivity is consistent with the distinctions drawn in *Beam Distilling* between "pure" prospective application and "modified" or "selective" application. "Pure" prospective application (not expressly eliminated as an option by *Beam Distilling*) requires the new rule be applied "neither to the parties in the law-making decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision." *Beam Distilling*, 115 L. Ed. 2d at 488. On the other hand, "modified" or "selective" prospectivity (expressly eliminated as an option in civil cases by *Beam Distilling*) is manifested when "a court [applies] a new rule in the case in which it is pronounced, then return[s] to the old one with respect to all others arising on facts predating the pronouncement." *Beam Distilling*, 115 L. Ed. 2d at 489.

The assertion that the *R/L Assocs.* invalidation was not applied retroactively because the plaintiff had challenged the fee and only paid into the court's registry in order to continue its court action fails. According to the *Beam Distilling* definition, the City cannot argue at this point for a purely prospective application of the *San Telmo* and *R/L Assocs.* decisions *because the rules announced in those cases were applied to the parties in those law-making decisions.* The *R/L Assocs.* and *San Telmo* decisions were retroactively applied, as it does not matter that the parties in those cases had not actually paid fees to the City before challenging the ordinances in question.

The City further contends it is unfair to grant refunds to plaintiffs who paid fees, did not challenge the HPO, and now sue based on the benefit of hard-fought battles won by others. It argues that in this case, unlike the case in *R/L Assocs.*, no class member challenged the ordinance fees and "[a]s far as the record shows, they paid their fees willingly and went on to build successful projects." Brief of Respondent-Cross Appellant, at 45. *Beam Distilling* addresses precisely this question of whether it is fair to allow parties who have not challenged a tax or fee regime to then, after an invalidation of a tax or fee, ride the coattails of successful challengers into court and enjoy the fruits of the labors of those who have struggled to defeat existing laws:

> [T]he petitioner now before us . . . did not challenge the Georgia law until after its fellow liquor distributors had won their battle in Bacchus. . . . Insofar as equality drives us, it might be argued that the new rule . . . should not be applied to those who only exploit others' efforts by litigating in the new rule's wake.
>
> . . . As for the putative hangers-on, they are merely asserting a right that the Court has told them is theirs in law, that the Court has not deemed necessary to apply on a prospective basis only, and that is not otherwise barred by state procedural requirements. They cannot be characterized as freeloaders any more than those who seek vindication under a new rule on facts arising after the rule's announcement. Those in each class rely on the labors of the first successful litigant. We might, of course, limit retroactive application to those who at least tried to fight their own battles by litigating before victory was certain. To this possibility, it is enough to say that distinguishing between those with cases pending and those without would only serve to encourage the filing of replicative suits when this or any other appellate court created the possibility of a new rule by taking a case for review.

(Citations omitted.) *Beam Distilling*, 115 L. Ed. 2d at 492-93. We agree.

We hold that refunds were properly available in this case, pursuant to an alternative theory of relief independent of a civil rights action, as the decisions of this court in *San Telmo* and *R/L Assocs.* were properly applied retroactively. The practice of retroactive application is "overwhelmingly the norm". *Beam Distilling*, 115 L. Ed. 2d at 488. Further-

more, under the *Beam Distilling* holding which we adopt, there is no balancing the equities to determine whether we should now apply rules which were applied retroactively in the *San Telmo* and *R/L Assocs.* decisions prospectively to the parties in this case:

> Nor, finally, are litigants to be distinguished for choice-of law purposes on the particular equities of their claims to prospectivity: whether they actually relied on the old rule and how they would suffer from retroactive application of the new. It is simply in the nature of precedent, as a necessary component of any system that aspires to fairness and equality, that the substantive law will not shift and spring on such a basis. To this extent, our decision here does limit the possible applications of the Chevron Oil analysis . . . Because the rejection of modified prospectivity precludes retroactive application of a new rule to some litigants when it is not applied to others, the Chevron Oil test cannot determine the choice of law by relying on the equities of the particular case.

*Beam Distilling*, 115 L. Ed. 2d at 493. We accordingly affirm the trial court award of refunds.

As to any property owners who may be present in the class who paid HPO fees pursuant to ordinance provisions *prior* to the invalidation of those provisions, such plaintiffs' remedies lie solely in refund relief, since there will be no initial showing of arbitrary and capricious conduct necessary for a section 1983 action. The right to refund relief is subject to the statute of limitation for refund actions, discussed below. By contrast, property owners who were assessed fees *after* trial court invalidation of applicable ordinance provisions may pursue damages remedies under section 1983, subject to the applicable limitations period for such actions in Washington.

## Applicable Statute of Limitation

In determining the applicable statute of limitation for this case, we address the proper limitations period not only for the trial court's grant of HPO payment refunds under RCW 4.16.080(3), but also to what extent such considerations impact the Robinsons' section 1983 claims.

The trial court in this case imposed a 3-year statute of limitation on the Robinsons' class claims, meaning that all class claims arising more than 3 years prior to the date the action was filed, May 1988, were time barred.

The Robinsons argue that no statute of limitation applies to their claims for compensation because it is an inverse condemnation action and that actions against the government for the taking or damaging of property are not time barred. They submit the trial court erred when it applied a 3-year limitation period by characterizing their claims as a refund action for invalidly imposed taxes or charges in reliance on *Hart v. Clark Cy.*, 52 Wn. App. 113, 758 P.2d 515 (1988). Alternatively, they argue that the 6-year statute of limitation, available in actions for lost rents and profits for the use and occupation of real estate, would be "preferable". Furthermore, argue the Robinsons, the City ought to be equitably estopped from asserting a statute of limitation defense at all.

A. Equitable Estoppel Rejected.

We address first the Robinsons' equitable estoppel argument as it attacks the ability of the City to even assert the defense. The Robinsons rely on a statement in *Hart v. Clark Cy., supra,* that the County in that case collected its fees in *good faith* and thus was not estopped from asserting the statute of limitation. By contrast, the Robinsons argue, in this case the City knew the HPO was invalid and therefore should be estopped. The *Hart* court noted that estoppel is available to prevent a defendant from raising a statute of limitation defense where the defendant has fraudulently or inequitably invited a plaintiff to forebear from commencing suit until the applicable statute of limitation has run, barring the plaintiff's action. *Hart,* at 119. The court in *Hart* did not apply the estoppel doctrine, however, because the requisite showing was not made. Nor have the Robinsons made the required showing in this case.

 Equitable estoppel is not favored, and the party asserting estoppel must prove each of its elements by clear, cogent, and convincing evidence. *Mercer v. State*, 48 Wn. App. 496, 500, 739 P.2d 703, *review denied*, 108 Wn.2d 1037 (1987). The elements to be proved are: first, an admission, statement, or act inconsistent with a claim afterward asserted; second, action by another in reasonable reliance on that act, statement, or admission; and third, injury to the party who relied if the court allows the first party to contradict or repudiate the prior act, statement, or admission. *Board of Regents of UW v. Seattle*, 108 Wn.2d 545, 551, 741 P.2d 11 (1987). Estoppel is appropriate to prohibit a defendant from raising a statute of limitations defense when a defendant has "*fraudulently* or *inequitably* invited a plaintiff to delay commencing suit until the applicable statute of limitation has expired." *Del Guzzi Constr. Co. v. Global Northwest Ltd.*, 105 Wn.2d 878, 885, 719 P.2d 120 (1986). The Robinsons do not argue or show that the City or any of its officials in any way invited any member of the Robinsons' class to delay filing suit. The existence of earlier decisions in this court upholding lower court challenges to the HPO bears testament to the fact that while the Robinsons and their class relented, others did bring suit. Because the City did nothing to induce delay in the filing of this action, we reject the plaintiffs' equitable estoppel argument.

B. 6-Year Limitation Period Inapplicable.

The Robinsons alternatively contend the 6-year statute of limitation period which governs actions "for the rents and profits or for the use and occupation of real estate" under RCW 4.16.040(3) is "preferable". This statute's limitation period is not applicable. The HPO requirement that owners replace housing or pay into the housing replacement fund cannot be equated with a dispute over rents or profits or the occupation of land; furthermore, the Robinsons cite no authority which would compel such an equation. We therefore reject the Robinsons' suggested statute of limitation preference.

### C. RCW 4.16.080(3) Applicable to Refunds.

 While the trial court's order does not expressly cite the basis for the court's conclusion that a 3-year limitation period is applicable, both parties appear to agree that the trial court relied upon *Hart v. Clark Cy.*, 52 Wn. App. 113, 758 P.2d 515 (1988). In *Hart*, the 3-year limitation period of RCW 4.16.080(3) was applied to an action for refund of money paid pursuant to a county ordinance, later held to impose an invalid tax, which required park development fees. Following this court's decision in *Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 650 P.2d 193 (1982), the County in *Hart* ceased imposing the fees and the plaintiffs filed suit. By affirming the trial court's application of the 3-year statute of limitation, the Court of Appeals in *Hart* barred the majority of the plaintiffs' claims. The court characterized the action as one based partly on an implied liability to repay money unlawfully received, and partly upon a theory of unjust enrichment, both theories subject to application of a 3-year statute. *Hart*, 52 Wn. App. at 116, 118. RCW 4.16.080(3) limits actions to 3 years for "an action upon a contract or *liability*, express or *implied*, which is not in writing, and does not arise out of any written instrument". (Italics ours.)

The court in *Hart* relied on decisions in which this court had applied the 3-year limitation period to refund actions for invalid taxes:

> The Washington Supreme Court has applied RCW 4.16-.080(3) to refund actions for invalid taxes. In *Corwin Inv. Co. v. White*, 166 Wash. 195, 6 P.2d 607 (1932), the court stated that "[a]n action against a county to recover void taxes is one which arises upon an implied contract, not in writing, and the three-year statute of limitations applies." . . . The underlying principle for the application of the 3-year statute of limitations is that suits seeking tax refunds "are actions arising out of implied liabilities to repay money unlawfully received . . ." *Adams Cy. v. Ritzville State Bank*, 154 Wash. 140, 144, 281 P. 332 (1929).
>
> In the present case, the trial court properly applied the 3-year statute of limitations. The Supreme Court in *Hillis*

*Homes* ruled that the fees imposed upon residential developments constitute taxes for which there had been no express grant of authority by the State Legislature. Therefore, these fees are "without authority and invalid." *Hillis Homes*, 97 Wn.2d at 808.

*Hart*, 52 Wn. App. at 115-16. We observe that in the Brief of Appellants, at 21, it is stated: "Here the City is improperly holding fees involuntarily paid under an invalid ordinance for real property development". This characterization of the Robinsons' demand for recovery is entirely consistent with the theory in *Hart*. Accordingly, we hold that to the extent relief is available to the plaintiffs on a basis other than the federal statutory civil rights relief of section 1983 (*i.e.*, if the plaintiffs are unsuccessful in their section 1983 action or seek refunds for payments made prior to declarations of ordinance invalidity), the 3-year statute of limitation of RCW 4.16.080(3) properly applies to the Robinsons' claims.

D. Inverse Condemnation Claims.

The Robinsons contend their action does not merely involve collection of invalid taxes or fees, but also interference with the use and enjoyment of property. They claim *Hart* does not apply, or should be limited or overruled, because governmental taking or damaging of property is of constitutional magnitude, so that mere passage of time cannot bar such a claim. In support of this contention they cite *Petersen v. Port of Seattle*, 94 Wn.2d 479, 618 P.2d 67 (1980) and *Highline Sch. Dist. 401 v. Port of Seattle*, 87 Wn.2d 6, 548 P.2d 1085 (1976). In those cases plaintiffs brought inverse condemnation actions against the Port of Seattle seeking compensation for increased noise at Seattle-Tacoma International Airport. This court held the claims were not subject to any time bar save the 10-year period for prescriptive right acquisition. *Petersen*, at 483; *Highline Sch. Dist.*, at 11. We have already concluded that this action is not one in inverse condemnation, as no taking has been established under this court's rule in *Presbytery*. Therefore, we do not engage in the analysis offered in reliance upon the *Petersen* and *Highline Sch. Dist.* cases.

In analyzing the Robinsons' section 1983 substantive due process claim, we have concluded that to the extent they can show that the continued enforcement of respective HPO provisions (after trial court declarations of invalidity and injunctions against continued enforcement) was arbitrary and capricious, the Robinsons can maintain a federal cause of action under 42 U.S.C. § 1983. We must therefore address the applicable limitation period for the Robinsons' claims to federal relief for violations of substantive due process.

E. Limitation Period for Section 1983 Claims.

The Robinsons stated a prima facie case for civil rights relief for their claims of substantive due process violations. Since these claims were improperly dismissed and may now be set for trial, the Robinsons have a valid theory of relief other than "an action upon a contract or liability, express or implied, which is not in writing, and does not arise out of any written instrument" under RCW 4.16-.080(3). We therefore seek the applicable limitation period for what may stand as an independent theory of relief, *i.e.*, the Robinsons' substantive due process claims under section 1983. We note that damages, if awarded, could differ in amount from refunds. Because there is no statute of limitation for section 1983 actions, federal courts formerly used the state statute of limitation applicable to a similar cause of action under the law of the State in which the action arose, as provided in *Board of Regents v. Tomanio*, 446 U.S. 478, 483-84, 64 L. Ed. 2d 440, 100 S. Ct. 1790 (1980). This rule was changed by the Supreme Court in *Wilson v. Garcia*, 471 U.S. 261, 276, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985), in which it was held that the appropriate statute of limitation for section 1983 actions is the same as the forum state's limitations period for personal injury cases. *See Krug v. Imbordino*, 896 F.2d 395 (9th Cir. 1990). Thus federal precedent under the *Wilson v. Garcia, supra,* rule requires the use of a single limitation period for section 1983 actions in each state. The Supreme Court has stated that courts entertaining section 1983 actions may in certain instances

employ the general or residual state statute of limitation for personal injury actions. *Owens v. Okure*, 488 U.S. 235, 249-50, 102 L. Ed. 2d 594, 109 S. Ct. 573 (1989). However, this is only when state law provides multiple statutes of limitation for personal injury actions:

> Courts should resort to residual statutes of limitations only where state law provides multiple statutes of limitations for personal injury actions and the residual one embraces, either explicitly or by judicial construction, unspecified personal injury actions.

*Owens v. Okure*, 488 U.S. at 250 n.12. *See* 1 S. Steinglass, *Section 1983 Litigation in State Courts* § 6.6(d) (Release 2 1989); *see also* Kibble-Smith, *Statutes of Limitation and Section 1983: Implications for Illinois Civil Rights Law*, 20 J. Mar. L. Rev. 415 (1986-1987).

The statute of limitation for personal injury actions in the state of Washington is 3 years under RCW 4.16.080(2). This 3-year period was held applicable to *Bivens* claims, *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics*, 403 U.S. 388, 29 L. Ed. 2d 619, 91 S. Ct. 1999 (1971), arising in the state of Washington in *Johnston v. Horne*, 875 F.2d 1415 (9th Cir. 1989). Thus the 3-year limitation period for personal injuries under Washington law applies to this section 1983 action.

1. *Accrual of Cause of Action.*

■ The next question to be addressed is when the Robinsons' substantive due process cause of action (in this instance, a class suit) accrued. While state law requires the use of state policies on *tolling* and revival of statutes of limitation, federal law controls the question of when a cause of action *accrues* when we discuss statutes of limitation for section 1983 purposes. *Norco Constr., Inc. v. King Cy.*, 801 F.2d 1143, 1145 (9th Cir. 1986). *See also* 1 S. Steinglass, at 6-37; *Chardon v. Fernandez*, 454 U.S. 6, 8, 70 L. Ed. 2d 6, 102 S. Ct. 28 (1981) (section 1983 claim accrued when a plaintiff knew or should have known of the injury that was basis of suit). In *Norco Constr.*, it was held that a developer's civil rights action against King County based on the County's

delay in acting on the developer's preliminary plat application accrued when the County made its final decision approving the application rather than when the developer became aware the County had treated it differently and would not act within the period provided by statute.

We note that in the land use context, it has been observed that other land use claims may be stated independent of a taking claim, and it is possible for section 1983 due process or other nontaking claims to accrue earlier than taking claims; taking claims entail more stringent ripeness requirements.[10] S. Steinglass, at 6-39. There has been considerable controversy on whether the ripeness requirements for takings claims announced in *Williamson Cy. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985) and *MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 91 L. Ed. 2d 285, 106 S. Ct. 2561 (1986) are applicable as an impediment to related, nontaking claims on the grounds that such claims have not yet accrued until taking claims are ripe. *Williamson* held that a Fifth Amendment taking claim is not ripe (and thus a cause of action does not accrue) until the landowner has sought and received a final judgment on state compensation procedures. *Williamson*, 473 U.S. at 194-95. However, the Ninth Circuit has held that the *Williamson* requirement that a federal takings plaintiff exhaust his or her state law remedies prior to bringing a claim did not extend to the plaintiff's claims that he or she had been

---

[10]"The application of [the] federal accrual policy to §1983 land use litigation depends upon the nature of the claim being advanced. For example, in a §1983 inverse condemnation [*i.e.*, taking] action a property owner is challenging not simply the regulatory taking but also the failure of the governmental entity to provide just compensation. Thus, in *McMillan v. Goleta Water District* [792 F.2d 1453 (9th Cir. 1986), *cert. denied*, 480 U.S. 906 (1987)], the Ninth Circuit relied on the ripeness requirement applied by the Supreme Court in taking claims to conclude that the §1983 taking claim did not accrue either when the Water District imposed a moratorium on new water connections (and thus interrupted the property owners' water service) or when it became clear that the interruption was not temporary. Rather, the action accrued almost ten years later when the Water District denied the property owners' formal application for an exception to the moratorium." (Footnotes omitted.) 1 S. Steinglass, at 6-38.

denied due process by the same state action. *Sinaloa Lk. Owners Ass'n v. Simi Vly.*, 882 F.2d 1398, 1404-05 (9th Cir. 1989), *cert. denied sub nom. Doody v. Sinaloa Lk. Owners Ass'n, Inc.* 494 U.S. 1016, 108 L. Ed. 2d 493, 110 S. Ct. 1317 (1990). In *Sinaloa*, the Ninth Circuit concluded that landowners' substantive due process claims arising out of the State's breaching of a privately owned dam and destruction of a lake was ripe, notwithstanding the fact that the landowners' failure to exhaust state law remedies had precluded their federal taking claims. *Sinaloa*, 882 F.2d at 1407. The *Sinaloa* decision was cited as consistent with the Ninth Circuit's decision in *Kaiser Dev. Co. v. Honolulu*, 898 F.2d 112, 113 (9th Cir. 1990). The *Kaiser* decision relied totally on the reasoning from *Kaiser Dev. Co. v. City & Cy. of Honolulu*, 649 F. Supp. 926 (D. Hawaii 1986), in which it was noted that the *Williamson* and *Yolo* concepts of ripeness and exhaustion do not preclude a plaintiff's claim that arbitrary and capricious state action violated substantive due process. 649 F. Supp. at 943 n.24.

█ Substantive due process claims differ from taking claims in that the plaintiff who has suffered a violation need not wait for the State to deny an adequate postdeprivation remedy before commencing suit. Substantive due process is violated at the moment harm occurs; thus, the existence of postdeprivation state remedies does not bar a section 1983 action. *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988) (citing *Rutherford v. Berkeley*, 780 F.2d 1444, 1447 (9th Cir. 1986)).

2. *Continuing Wrong Theory Inapplicable.*

It is also noted in commentary that some federal courts have considered tolling the running of, or delaying the accrual of, the statute of limitation in section 1983 land use actions under the "continuing wrong" theory. *See* 1 S. Steinglass § 6.6(d) (citing *Ocean Acres Ltd. Partnership v. Dare Cy. Bd. of Health*, 707 F.2d 103, 106 (4th Cir. 1983); *Gordon v. Warren*, 579 F.2d 386, 391 (6th Cir. 1978); *De Botton v. Marple Township*, 689 F. Supp. 477, 480 (E.D. Pa. 1988); *Moore v. Costa Mesa*, 678 F. Supp. 1448, 1449 (C.D. Cal.

1987); *Jackson v. City Coun.*, 659 F. Supp. 470, 474-75 (W.D. Va. 1987), *aff'd in part, vacated in part on other grounds*, 840 F.2d 10 (4th Cir. 1988)). There is a split among jurisdictions as to the function and availability of the continuing wrong theory.

However, the Ninth Circuit has rejected this theory in the regulatory taking and land use context. *See Azul Pacifico, Inc. v. Los Angeles*, 948 F.2d 575, 584 (9th Cir. 1991); *De Anza Properties X, Ltd. v. County of Santa Cruz*, 936 F.2d 1084, 1087 (9th Cir. 1991). Since the Ninth Circuit has not embraced the continuing wrong theory, it is not available in this case.

The policy behind statutes of limitation is to ensure essential fairness to defendants and to bar plaintiffs who have "slept on [their] rights." *Burnett v. New York Cent. R.R.*, 380 U.S. 424, 428, 13 L. Ed. 2d 941, 85 S. Ct. 1050 (1965). The plaintiffs in this case did not bring state actions prior to raising their federal claims so as to toll the statute of limitation during the pendency of their state court proceedings. The nature of the wrongful conduct alleged in this section 1983 action is the enforcement of respective HPO provisions after trial courts had declared them invalid and issued injunctions against continued enforcement. Insofar as the section 1983 claim is concerned, the federal substantive due process rights of the respective class members, if violated, were violated at the instant this improper enforcement came to bear upon each of them. We are therefore not persuaded that this case presents a "continuing wrong" vis-a-vis the respective class members.

In this case the respective class members' section 1983 causes of action accrued (*i.e.*, substantive due process was violated by allegedly arbitrary and capricious conduct) when they were assessed fees by the City pursuant to the HPO, as a requirement for obtaining a license, after the applicable provisions of the ordinance had been declared invalid by trial courts and further enforcement had been enjoined.

We hold that the moment of imposition of fees pursuant to invalidated HPO provisions by the City against

each of the respective class members as a condition of removing low income housing gave each respective class member a basis for asserting a section 1983 substantive due process claim against the City. The 3-year statute of limitation began running on each of these respective claims at the moment of fee imposition, which was the moment the respective causes accrued.

We accordingly hold that since the 3-year statute of limitation applies, all section 1983 claims by class members which arose prior to the period of 3 years before May 27, 1988, the date of the filing of the complaint, are time barred.

## Attorney Fees

Due to the fact that the dismissal of the Robinsons' action under section 1983 has been reversed and the cause may proceed to trial, it is not necessary at this time to address the issue of attorney fees.

## CONCLUSION

We remand this case to the trial court for determination of the liability of individual defendants and the liability of the City of Seattle under the plaintiffs' section 1983 substantive due process claims, and to decide to what degree civil rights damages, if awarded, would differ or exceed refunds validly awarded the Robinsons. The question of attorney fees must await the settlement, or the outcome, of the reinstated civil rights action.

DORE, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, DURHAM, SMITH, and JOHNSON, JJ., concur.

Reconsideration denied June 18, 1992.