4 P.3d 159 (2000)
The CITY OF SEATTLE, a municipal corporation, and the Seattle Police Department, Respondents,
v.
Oscar McCOY and Barbara McCoy, husband and wife d/b/a Oscar's II, Appellants,
Wilmer P. Morgan n/k/a Maagnus Morgan, a single man, and Gwen D. Dixon, a single woman; and Real Property Located at 2051 E. Madison Street, Seattle, Washington, County of King, Defendants.
No. 42873-0-I.
Court of Appeals of Washington, Division 1.
July 17, 2000.
*161 David Robert Osgood, Seattle, for Appellants.
Shelley Jayne Hickey, Assistant City Attorney, Seattle, for Respondents.
David Zuckerman, Seattle, for Amicus Curiae (1) American Civil Liberties Union.
Jeanie J. Mohler, Office of City Attorney, Spokane, for Amicus Curiae (2) Wash. St. Assn. of Municipal Attorney.
Richard Dale Shepard, Tacoma, for Amicus Curiae (3) Northwest Legal Foundation.
John William Cobb, Deputy Prosecuting Attorney, Seattle, for Amicus Curiae (4) WA Assn. of Pros. Attorneys.
John Charles McCullough, Jr., Seattle, for Amicus Curiae (5 & 6) Rainier Chamber of Commerce Downtown Seattle Assn.
Artee Felicita Young, Seattle, for Amicus Curiae (7) Pac. N.W. Chapter Nat'. Black Chamber.
James Lawrence Varnell, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, for Defendants, Wilmer P. Morgan, Gwen D. Dixon.
*160 APPELWICK, J.
Oscar and Barbara McCoy own Oscar's II, a restaurant and lounge in Seattle. The City of Seattle filed a complaint against the McCoys, alleging that the building constituted a drug nuisance under RCW 7.43, because of illegal drug activity on the premises. The trial court found that Oscar's "is a drug nuisance pursuant to Chapter 7.43 RCW and for one year shall be abated and closed to further operation of Oscar's by and through the [d]efendants' McCoy." The order triggered a statutory provision placing the property in custody of the court. A stay was entered pending appeal.
The McCoys challenge the constitutionality of RCW 7.43 under the United States Constitution as a taking without compensation both facially and as applied, as a violation of due process, and as void for vagueness. The McCoys also challenge evidentiary rulings of the trial court. Amicus alleges application of the statute is unconstitutional on the basis of *162 discriminatory application against African-Americans.[1]
We hold that RCW 7.43 as applied to the McCoys violates the Fifth and Fourteenth Amendments to the United States Constitution. The application of the statute on these facts constitutes a taking of property without compensation and without due process of law. State nuisance and property common law is not an exception to a taking under these facts. We do not reach the vagueness issue, having found the statute unconstitutional on other grounds.
The McCoys have not preserved their objection to the evidentiary issues. The record is not adequate to allow consideration of the discrimination claims.
Therefore, we vacate the order of abatement entered by the trial court.

FACTS
Oscar and Barbara McCoy are the owners and operators of Oscar's II, a restaurant and lounge in Seattle's Central District. They lease the property at that location from Wilmer Morgan and Gwen Dixon.[2] Oscar McCoy opened his restaurant in 1976, and moved it to its present location in February 1986. From the beginning, the restaurant catered to an older crowd, and operated for thirteen years without any particular problems.
At some point in 1989, an establishment called the "Cotton Club" closed, and its patrons, a younger clientele, began frequenting Oscar's. With the younger crowd, the McCoys began experiencing difficulties with fights and disturbances, some of which were gang-related.[3] At approximately the same time, the McCoys were contacted by two beat officers assigned to patrol "hot spots" in the Central District, Sam Derezes and Eric Zerr. Both officers worked with the McCoys to implement security measures inside of Oscar's, including hiring security, checking patrons' identification at the door, and maintaining a trespass list. According to Officer Derezes, Oscar McCoy followed all of the suggestions made to him to help keep the criminal element out of the business. The McCoys allowed agents of the United State Drug Enforcement Agency to use their establishment as a place to surveil narcotics activity on the street. And, Oscar McCoy routinely testified in court against people "trespassed" from his business, that is, people removed from the premises for violating a prior police notice not to come onto the property.
For a five year period beginning in 1994, Officers Derezes and Zerr assisted the McCoys with maintaining order at Oscar's, routinely identifying to Oscar McCoy persons they had arrested, or persons known to them as being suspected narcotics traffickers. Invariably, Oscar McCoy would ban these suspected traffickers from the establishment.
In 1994, due to a manpower shortage, the Seattle Police Department (SPD) discontinued the operation of regular footbeat patrols in the area where Oscar's is located, and Officers Derezes and Zerr were transferred out of the area. However, the SPD continued to regularly patrol the area around Oscar's by vehicle and uniformed patrol officers occasionally walked through Oscar's. Patrol officers continued to make drug arrests inside Oscar's. Patrol and community police team officers notified Oscar McCoy of these narcotics arrests and the narcotics trafficking occurring in and around his business, and gave Oscar McCoy suggestions on how he could prevent drug trafficking at Oscar's.
*163 The McCoys asked for an increased police presence in the area and a better 911 response. The McCoys' requests were denied on the basis of insufficient police resources.
And, in late 1994, the police department initiated a drug abatement file on Oscar's. The police also discontinued their practice of providing information to the McCoys about known drug dealers.
The SPD then formally notified Oscar McCoy in writing of the illegal drug sales occurring at Oscar's, told him of his responsibility to operate his business in a manner which did not allow drug trafficking to occur on the premises, and warned him of the potential closing of his business pursuant to the Drug Nuisance statute, RCW 7.43, if drug trafficking was not prevented. The SPD and Oscar McCoy met to discuss these matters at which time Oscar McCoy was presented with a Drug Elimination Plan (DEP), consisting of fifteen suggested actions the McCoys could take to deter drug trafficking at Oscar's.
The suggestions contained in the DEP were: 1) a SPD record check of all employees; 2) no violation of state liquor codes; 3) locked bathrooms with one employee in control of the keys; 4) employment of security personnel on weekends and evenings and security checking of all customers for weapons; 5) maintenance of an "86" list documenting persons who have been excluded from the business; 6) inside and outside lighting sufficient to allow employees to observe customer activity; 7) installation of a video camera; 8) posting of "no loitering" and "no drug activity" signs on the front door; 9) removal of inside pay phone and restricting use of inside phones to employees only; 10) identification checking of all customers; 11) initiating a criminal trespass agreement with the Community Police Team (CPT) to allow the police to exclude unauthorized persons when requested to do so by the McCoys; 12) institution of an entry fee and re-admittance fee; 13) institution of a policy to contact a CPT officer, the Anti-Crime Team officer or call 911 to report drug activity; 14) securing of the back door to make it exit only (with alarmed emergency exit bar); and 15) implementing a dress code, i.e., not allowing any gang attire.
The McCoys had been implementing some suggestions already and implemented many others. The parties dispute the timing, duration, or extent of the implementation of locked bathrooms, installation of a video camera or dummy camera, removal of the phone, and securing of the back door. The trial court's memorandum decision[4] states that the proposals that had "not been implemented [were] for the most part too expensive or [ineffective]." Oscar's was a continuing target for abatement by the SPD.
Over a period of twenty-seven months, covering parts of 1995 through 1997, confidential informants worked under the direction of the SPD and made eighteen narcotics purchases inside of Oscar's. The SPD used various confidential informants and purchased from different drug dealers, except on one occasion where a dealer was paged for a second purchase. The dealer arrived at Oscar's by car in response to the page. These undercover narcotics purchases did not result in arrests. Nor did the SPD inform the McCoys that the purchases were being made inside their business or that these suspected drug dealers were operating out of Oscar's. The alleged drug dealers were never identified to the McCoys. Seattle Police Detective Diaz clearly testified that these investigations were conducted for the sole purpose of abating Oscar's.
No one linked Oscar or Barbara McCoy to drug sales in the establishment, and the unrefuted testimony of their employees and patrons indicated that none of them had ever witnessed drug sales on the premises.
On November 5, 1997, the City of Seattle filed a complaint against the McCoys in King County Superior Court, alleging that the McCoys "are and have been using, maintaining or permitting Oscar's ... to be used for the purpose of unlawfully manufacturing, delivering, selling, storing, or giving away controlled substances[.]" The City sought a declaration that the property on which Oscar's is located is a drug nuisance under *164 RCW 7.43. Accordingly, it asked the court to close Oscar's and to prohibit its "use for any purpose" for one year.
The trial court's memorandum decision stated that the McCoys made "reasonable efforts to address the problem[,]" and "have not in any sense `permitted' the existence of the nuisance in the sense of having allowed it, furthered it, or condoned it." The trial court further noted that when the police department's focus shifted from working with the McCoys to gathering evidence against them, "the McCoys were essentially powerless to stop the inevitable. The drug problem continued, it probably intensified, and a nuisance is the result."
Nonetheless, the trial court also found that the "McCoys have not been able to abate the drug nuisance at Oscar'[s] in the past, and have failed to ... present evidence that they will immediately abate the nuisance as required under RCW 7.43.080(2)(c) to obviate an order of abatement." The trial court then concluded that "the premises located at 2051 Madison St., Seattle, Washington is a drug nuisance pursuant to Chapter 7.43 RCW and for one year shall be abated and closed to further operation of Oscar's by and through the [d]efendants' McCoy." The court also prohibited the McCoys from entering the property for any reason: "The [d]efendants McCoy shall completely vacate the property located at 2051 Madison Street, Seattle, Washington within twenty-four (24) hours after entry of this Order, and shall not re-enter Oscar's for any reason for a period of one year[.]"
On appeal, the McCoys contend that RCW 7.43, on its face and as applied, violates the United States Constitution.[5] Pending appeal, this court stayed the trial court's abatement order. On February 25, 1999, the City moved this court to permit the trial court to vacate its order of abatement, contending that Oscar's is no longer a drug nuisance. The City did not seek dismissal of this case on mootness grounds. The court denied the City's motion after hearing oral argument.

ANALYSIS
I. THE DRUG NUISANCE STATUTE, RCW 7.43
Under the drug nuisance statute, RCW 7.43.010, every building that is used to manufacture, sell, or store illegal drugs is a nuisance:
(1) Every building or unit within a building used for the purpose of unlawfully manufacturing, delivering, selling, storing, or giving away any controlled substance... and every building or unit within a building wherein or upon which such acts take place, is a nuisance which shall be enjoined, abated, and prevented, whether it is a public or private nuisance.
RCW 7.43.080 provides:
(1) Except as provided in subsection (2) of this section, if the existence of the nuisance is established in the action, an order of abatement shall be entered as part of the final judgment in the case. Plaintiff's costs in the action, including those of abatement, are a lien upon the building or unit within a building. The lien is enforceable and collectible by execution issued by order of the court.
(2) If the court finds and concludes that the owner of the building or unit within a building: (a) Had no knowledge of the existence of the nuisance or has been making reasonable efforts to abate the nuisance, (b) has not been guilty of any contempt of court in the proceedings, and (c) will immediately abate any such nuisance that may exist at the building or unit within a building and prevent it from being a nuisance within a period of one year thereafter, the court shall, if satisfied of the owner's good faith, order the building or unit within a building to be delivered to the owner, and no order of abatement shall be entered. If an order of abatement has been entered and the owner subsequently meets the requirements of this subsection, the order of abatement shall be canceled.
*165 Under RCW 7.43.090, the court may issue an order, upon a showing that an unpreventable nuisance exits, that shall:
(1) Direct the removal of all personal property subject to seizure and forfeiture pursuant to RCW 69.50.505 from the building or unit within a building, and direct their disposition pursuant to the forfeiture provisions of RCW 69.50.505;
(2) Provide for the immediate closure of the building or unit within a building against its use for any purpose, and for keeping it closed for a period of one year unless released sooner as provided in this chapter; and
(3) State that while the order of abatement remains in effect the building or unit within a building shall remain in the custody of the court.
II. THE "FACIAL" CHALLENGE: AN UNCONSTITUTIONAL TAKING
The McCoys argue that the mere enactment of RCW 7.43 constitutes a taking in violation of the Fifth Amendment. The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. CONST. AMEND. V. "A statute is presumed to be constitutional and the challenger bears the burden of establishing the unconstitutionality of the legislation beyond a reasonable doubt." Brower v. State, 137 Wash.2d 44, 52, 969 P.2d 42 (1998), cert. denied, 526 U.S. 1088, 119 S.Ct. 1498, 143 L.Ed.2d 652 (1999). "Under a facial challenge to a land use regulation, the landowner must show that the mere enactment of the regulation constitutes a taking." Guimont v. Clarke, 121 Wash.2d 586, 605, 854 P.2d 1 (1993) (citing Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 493, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)). The McCoys maintain that RCW 7.43, which allows their building to be declared a nuisance to be abated and to be put in the custody of the court, denies them a fundamental attribute of property, and is a "per se constitutional taking requiring just compensation." Guimont, 121 Wash.2d at 603, 854 P.2d 1; accord Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015-16, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).
In the Lucas, case, David H. Lucas purchased two residential lots in South Carolina on which he intended to build single-family homes. Lucas, 505 U.S. at 1006-07, 112 S.Ct. 2886. Two years later, the South Carolina Legislature enacted a statute that barred him from "erecting any permanent habitable structures on his two parcels." Lucas, 505 U.S. at 1007, 112 S.Ct. 2886. Lucas challenged this statute, contending it was a taking without just compensation in violation of the Fifth Amendment. Lucas, 505 U.S. at 1009, 112 S.Ct. 2886. The U.S. Supreme Court concluded that although property owners are not entitled to just compensation for "proscribed use interests [that] were not part of [the property owner's] title to begin with[,]" when "a regulation that declares `off-limits' all economically productive or beneficial uses of land goes beyond what the relevant background [nuisance and property] principles would dictate, compensation must be paid to sustain it." Lucas, 505 U.S. at 1027, 1030, 112 S.Ct. 2886 (footnotes omitted). The loss of Lucas' property right was automatic and was independent of any subsequent triggering act.
The McCoys' claim in this case is based upon the plain language of RCW 7.43 (the "building ... is a ... nuisance"), and the statute's mandate that the court take control of the property and exclude the owners. As the City contends, use of the property for unlawful drug activity constitutes the nuisance, not the property per se. However poorly the statute is worded, the fact is that abatement is only triggered by unlawful, criminal drug activity on or in the property. Therefore, the statute does not operate as a taking by mere enactment, but upon only proof of subsequent unlawful drug activity. Unlike the statute at issue in Lucas, which applied to property owners by virtue of the Legislature's enactment, RCW 7.43 is triggered by unlawful drug activity. Because the "bundle of rights" the McCoys acquired when they obtained their interest in the property did not include a right to house unlawful drug activity, the McCoys are not entitled to compensation as a result of the *166 City's efforts to eliminate such activity. See Lucas, 505 U.S. at 1027, 112 S.Ct. 2886. As a result, the mere enactment of RCW 7.43 did not deny the McCoys a fundamental attribute of property. Accordingly, the McCoys cannot and have not established beyond a reasonable doubt that RCW 7.43, on its face, constitutes a taking without just compensation in violation of the Fifth Amendment.
III. THE "AS APPLIED" CHALLENGE: AN UNCONSTITUTIONAL TAKING
A. The "Takings" Analysis
The McCoys argue that RCW 7.43 as applied to them is an unconstitutional taking, because it denies them of all economically viable use of the property without compensation. The City argues there is no evidence the McCoys have been denied all economic use of their property. The City further argues that even if all economic use of the property were denied, common law nuisance principles exempt RCW 7.43 from being an unconstitutional taking. The parties agree that two cases are of particular importance. The first is Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), which recognizes an exception to federal takings analysis grounded in state common law nuisance principles. The second is Guimont v. Clarke, 121 Wash.2d 586, 854 P.2d 1 (1993), which outlines the framework for analyzing regulatory takings.
Under these cases, the McCoys must first prove that the statute as applied destroys or derogates a fundamental attribute of property. A fundamental attribute of property includes the right to possess, to exclude others, and to dispose of the property. Guimont, 121 Wash.2d at 602, 854 P.2d 1. Another attribute appears to be the right to make some economically viable use of the property. See Lucas, 505 U.S. at 1003, 112 S.Ct. 2886. Establishing a physical invasion of the property or that the regulation denies all economically viable use would be a total taking, which is categorically compensable.
The McCoys argue that the plain language of the court's order is such a total taking. The pertinent portions of RCW 7.43.080(1) and RCW 7.43.090(2) provide:
(1) Except as provided in subsection (2) of this section, if the existence of the nuisance is established in the action, an order of abatement shall be entered as part of the final judgment in the case. Plaintiff's costs in the action, including those of abatement, are a lien upon the building or unit within a building. The lien is enforceable and collectible by execution issued by order of the court.
(2) Provide for the immediate closure of the building or unit within a building against its use for any purpose, and for keeping it closed for a period of one year unless released sooner as provided in this chapter[.]
The order tracks these statutory provisions and provides:
1. The Court finds that the premises located at 2051 E. Madison St., Seattle, Washington is a drug nuisance pursuant to Chapter 7.43 RCW and for one year shall be abated and closed to further operation of Oscar's by and through the [d]efendants' McCoy.
2. The [d]efendants McCoy shall completely vacate the property located at 2051 Madison Street, Seattle, Washington within twenty-four (24) hours after entry of this Order, and shall not re-enter Oscar's for any reason for a period of one year. (Emphasis added.)
The language precludes re-entry by McCoys. The statute provides for finding the building a nuisance, if illegal drug activity is present. The order effectively abates both the building and the business activity by pre-empting re-entry for any reason for one year. By virtue of the abatement order, RCW 7.43.090(3) places the building in the custody of the court. Therefore, the McCoys are not in possession. They cannot put the property to any economically viable use pending the expiration of one year, or further order of the court lifting its order.
This constitutes a total taking, though not a permanent taking. "[T]emporary" takings are subject to the same categorical treatment as permanent takings where the *167 regulation denies all use of the property. First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304, 318, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The trial court's order works a temporary, compensable taking until it expires or is earlier terminated. This conclusion would not change even if the order was earlier terminated because the McCoys proposed to open a different kind of business, which the court was satisfied was free from the illegal activity. A temporary, total taking would still occur, only the duration would change.
B. The Nuisance Exception to Takings
We need not make a public benefit or public interest analysis at this stage, but instead go directly to consideration of the nuisance exception to a taking.
However, Lucas makes clear that a "total takings" claim, alleging deprivation of all economically viable use, does not require analysis of whether the regulation goes beyond preventing a public harm to conferring a public benefit. Lucas, [505 U.S. at 1025, 112 S.Ct. at 2898] 120 L.Ed.2d at 819. Likewise, any analysis of the public interest advanced in support of the regulation is irrelevant to a "total takings" claim unless the State can show that the economically viable use denied by the regulation was already barred by existing common law principles of the State's property and nuisance law. See Lucas, [505 U.S. at 1013-15, 112 S.Ct. at 2892-93] 120 L.Ed.2d at 812-813.
Guimont, 121 Wash.2d at 600, 854 P.2d 1. The City must therefore carry its burden to overcome the categorical taking by establishing the common law nuisance exception.
The City maintains that it has met its burden of establishing a common law nuisance exception based upon a showing that illegal drug transactions continued at the McCoys' premises after the police department provided notice to the McCoys of illegal drug activity. Since the McCoys excluded anyone from the premises who was identified to them as engaged in illegal drug activity, they abated the "nuisance" activity flowing from those activities. The existence of a common law nuisance in this case, therefore, is limited to illegal drug activity which was not known to the McCoys when it was occurring and for which the identity of the participants was unknown. The question then is whether the common law of nuisance would have allowed abatement of the lawful business activity against an innocent owner for the illegal drug activities of unidentified business patrons which, when the activities occurred, were unknown and may not have been observable. Is the owner strictly liable to have his business abated, or does the risk depend on the reasonableness of the owners' actions based on the information-actual and constructive-the owners possess?
1. Nuisance Per Se
The economically viable use being denied to the McCoys is the operation of a restaurant and lounge. "A lawful business is never a nuisance per se, but may become a nuisance by reason of circumstances." Tiegs v. Watts, 135 Wash.2d 1, 13, 954 P.2d 877 (1998); see also RCW 7.48.160 (Nothing which is done or maintained under the express authority of a statute, can be deemed a nuisance.). Nuisance law would not have allowed closure of Oscar's for its lawful service of food and beverage. It is the failure of the McCoys to prevent illegal drug activities on the premises which the City asserts is the basis for abatement.
An abatement order may require closing a business if that business cannot operate without creating a nuisance:
If the business of the appellant can be conducted on the premises described in the information, in such a manner as not to cause or create a nuisance, he [or she] should be permitted to so conduct it. If it cannot, the rights of the appellant must yield to those of the public. (Emphasis added.)
State v. Schaefer, 45 Wash. 9, 11-12, 87 P. 949 (1906). The record does not support a finding that the McCoys or their employees were engaged in any illegal drug activity on the premises. The record does not show the McCoys consented to the drug activity or even had knowledge of any illegal drug transaction when it occurred. The record *168 does not support a finding that the McCoys acquiesced in illegal drug activity or turned a blind eye to it. The McCoys consistently sought police assistance. The McCoys posted a notice against illegal drug activity. They entered into a trespass agreement with law enforcement which allowed police to remove individuals and cite them if they returned to the premises within a year. The McCoys cooperated in the implementation of the agreement. They regularly excluded people who had been arrested, were suspected of drug dealings or who had been "trespassed" and Oscar McCoy testified against them in court. The McCoys allowed DEA agents to use the premises to monitor drug activity in the vicinity. They routinely called 911 to report criminal activity and other problems known to them. The McCoys met with police to discuss actions they could take to discourage illegal drug activity by patrons. And, they implemented many but not all of the SPD's recommendations, though they had no legal obligation to do so.
The trial court found that the McCoys had made reasonable efforts to eliminate the illegal drug activity, but had not been successful. The court further found that the McCoys could not show they could immediately eliminate illegal drug activity in the future.
The trial court's findings are not surprising. Constitutional rights protect individuals, including business patrons, from searches and surveillance necessary for such a guarantee. Prisons and jails cannot make such guarantees even with strip searches, body cavity searches, drug detection dogs, camera surveillance, and guards. It certainly cannot be presumed possible that the owners of restaurants, bars, department stores, office buildings, and civic arenas can guarantee that they will detect every incident of illegal drug activity, let alone prevent it. To believe otherwise would require a presumption that an owner could see through clothes, tables, walls, and doors, as well as to read minds. Indeed law enforcement cannot guarantee what the McCoys were being asked to guarantee.
With the clandestine nature of undercover and confidential informant drug buys like those conducted here, there is no way for any owner of a public or private building to avoid being caught and subjected to abatement. Owners simply cannot avoid closure of their building and business when they cannot identify or anticipate who will engage in illegal activity and when. In reality, owners cannot strictly prevent all illegal drug activity on the premises of their property. The statutory language imposes an impossible burden.
The McCoys were virtually helpless to prevent the undercover drug transactions conducted by police. The McCoys made reasonable efforts to stop and prevent repeat illegal drug activity by patrons when those patrons were identified. The McCoys did not cause nor create a nuisance. The McCoys' business was not a nuisance per se.
2. Washington Case Law
The City cites to a wide range of cases. We will consider those involving business patrons. In Kitsap County v. Kev, Inc., 106 Wash.2d 135, 139-140, 720 P.2d 818 (1986), the closure of the erotic dance studio had a factual basis including an officer witnessing drug use by employees and a manager and employees making contacts for prostitution. The illegal acts flowed from and mixed with the business activity. This is factually distinct from the operation of Oscar's. Similarly, in State v. Clancy, 99 Wash. 47, 168 P. 894 (1917), the women employees were employed to draw men in and to solicit patrons to buy alcoholic drinks, in violation of the statute. In State ex rel. Kern v. Jerome, 80 Wash. 261, 141 P. 753 (1914), the owner was operating a house of prostitution. In Town of Kirkland v. John A. Ferry, 45 Wash. 663, 88 P. 1123 (1907), the illegal liquor on the premises was known to the owner; he was selling it without a license. None of the cases cited involved strictly the illegal activity of patrons which became known to the owner only after the fact. No state case law establishes a prior abatement of a business based on illegal acts of business patrons where the owner was not involved in or aware of the illegal activity at the time.
Bellingham v. Chin, 98 Wash.App. 60, 988 P.2d 479 (1999), review denied, No. 69285-8, 140 Wash.2d 1026 (Wash.2000), involved application *169 of the drug nuisance statute to a tavern. No constitutional issues were raised in that appeal. The trial court found that the owner should have known about the ongoing drug dealing on the premises. Chin, 98 Wash.App. at 65, 988 P.2d 479. The activity was pervasive and flagrant. Chin, 98 Wash. App. at 65, 988 P.2d 479. The bartenders were overheard answering the phone "what pharmacist do you want to talk to?" Chin, 98 Wash.App. at 63, 988 P.2d 479. The trial court found Chin made no effort to prevent the drug activity other than delegating the responsibility to two bartenders. Chin, 98 Wash.App. at 65, 988 P.2d 479. The involvement of the bartenders may make Chin more akin to cases cited above, than to this case. However, if we assume that Chin had only constructive knowledge of the illegal drug activity comparable to the information the police supplied the McCoys, one difference stands out. The trial court found that the McCoys had made reasonable efforts to stop the illegal activity.
3. Restatement of Torts
The parties and amicus direct our attention to the Restatement (Second) of Torts. Section 838 (1977), entitled "Possessor Who Fails to Prevent Nuisance Caused by Activity," provides:
A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and
(a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and
(b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance.
The McCoys are possessors of land. See Restatement (Second) of Torts § 328E (1977). The illegal drug activities alleged to be a nuisance were carried on by third persons. The McCoys did not know who was engaged in the illegal activity nor when it was occurring. The record does not show the McCoys had reason to know about specific illegal acts as they were happening. However, they were told after the fact that police had successfully arranged undercover buys or had observed illegal drugs in the possession of patrons in the restroom. This would satisfy the "has reason to know" portion of section 838(a). Even if knowledge of the illegal activity after the fact was enough to satisfy the first prong of section 838, neither component of the second prong is satisfied. The record does not support a finding that the McCoys consented to the illegal activity. The court found the McCoys had made reasonable efforts to address the problem. Therefore, operation of Oscar's was not an abatable nuisance under the Restatement test.
4. Out-of-State Cases
The parties also urge us to consider out-of-state cases. We are not bound to do so, since the test for the nuisance exception under Lucas is the state law in effect when the McCoys acquired their property interests. Lucas, 505 U.S. at 1027, 112 S.Ct. 2886. However, a review of those cases is illustrative.
The McCoys cite City of St. Petersburg v. Bowen, 675 So.2d 626, 628, rev. denied, 680 So.2d 421 (1996), cert. denied, 520 U.S. 1110, 117 S.Ct. 1120, 137 L.Ed.2d 320 (1997). There, the City sought abatement of an apartment "building used by a youth and street gang for the purpose of conducting a pattern of youth and street gang activity," as provided by the nuisance statute. No unlawful activity by the owner was alleged. The building was closed for a year as such a nuisance. The Court of Appeals found closure to be a taking requiring just compensation.
The City cites City of Miami v. Keshbro, Inc., 717 So.2d 601 (Fla. DCA 1998), rev. granted, 729 So.2d 392 (1999). The City Nuisance Abatement Board closed a fifty-seven unit motel for drug and prostitution activity. The court found the nuisance exception of Lucas applied. A brothel and drug house had no protection at common law and were not part of the owner's bundle of rights. Keshbro, 717 So.2d at 605. The record showed that the prostitution and drug activity were inextricably intertwined with *170 the motel, and in reality, the motel was not a motel but a brothel and a drug house. In a footnote, the court explained that the decision did not conflict with Bowen:
It is for this reason that we do not certify conflict with City of St. Petersburg v. Bowen; i.e., Bowen does not include any discussion of inextricable intertwining of proscribed uses with other, valid, uses.
Keshbro, 717 So.2d at 604 n. 8.
In Pizza v. Rezcallah, 84 Ohio St.3d 116, 702 N.E.2d 81 (1998), the Ohio Supreme Court considered several cases involving application of the Ohio drug abatement statute; each case involved a tenant or third party engaged in drug activity in residential property. The court found the nuisance activity could be established without proof of the owner's knowledge or culpability. The Ohio statute provided no remedy short of a mandate for abatement once the nuisance was found to exist. The Ohio statute is very similar to Washington's, except a bond is required for early termination of an order. In addition, if the person committing the nuisance is a tenant, the owner of the building can prevent the nuisance if he or she voids the lease. OHIO REV.CODE ANN. §§ 3767.01-3767.11 (Banks-Baldwin 1997). Relying on Lucas, the Ohio court found the closures of the properties for one year was a taking akin to a forfeiture, but noted:
that not all forfeitures or temporary takings without compensation are constitutionally infirm. The United States Supreme Court has held in a long line of cases that a state may use its police power to enjoin a property owner from activities akin to public nuisances without offending either the Due Process or Takings Clause. This court has also upheld the validity of forfeitures and closure orders resulting from nuisance abatement actions.
. . .
The law regarding seizures and forfeitures of property has received growing judicial attention in recent years, based, at least in part, on its increased governmental use. Though the federal courts have upheld forfeiture statues even as applied to innocent owners in a variety of contexts, they have also consistently recognized in dicta or by express reservation of comment that there are factual situations in which forfeitures exercised against innocent owners will be held to violate constitutional standards.
Pizza, 702 N.E.2d at 89-90. Based on this analysis, the Ohio court found the one year closure orders were seizures and forfeitures violating both the federal takings clause and due process clause. This analysis eliminates a distinction between drug seizure statutes which authorize permanent forfeiture, except where the owner proves no knowledge of or consent to the illegal use (see RCW 69.50.505(8)), and the temporary "forfeiture" from a one year closure order where the statute does not require owner knowledge or consent as a necessary element or defense (see RCW 7.43.010, .100).
The court also looked to the facts of the owner's actions and the purposes of the statute:
[T]here is evidence to suggest that [the defendants] all took affirmative actions to determine whether illegal activity was occurring, to notify and/or cooperate with police in investigating and terminating the illegal activities, and to use legal means available to them to remove the offenders from the property and abate the nuisance in a timely fashion.
. . .
The records in these cases support a finding that each of the three defendants not only remained uninvolved in and originally unaware of the wrongful activity, but took reasonable measures to stop the proscribed use of his or her property upon discovering it. In fact, it is difficult to conceive of additional measures the defendants could have legally and safely taken which could have prevented or more quickly put an end to the illegal activities.
Pizza, 702 N.E.2d at 91. The McCoys similarly reported problems to police, entered into a trespass agreement, "trespassed" people arrested for drug activity, "trespassed" people identified to them by law enforcement as people suspected of being involved in drug activity, and testified in court against those "trespassed." They routinely and uniformly excluded the people known to or believed to *171 be engaged in drug activitythe nuisance activity. They excluded the nuisance actors and the nuisance activity whenever they were aware of it. They implemented most of the suggestions made by law enforcement, but did not follow through with others. However, the record does not suggest that those measures not undertaken or any others could have prevented every instance of illegal drug activity, including police informant buys.
In the Ohio cases, the State argued that the mandatory closure provisions protected the public by providing an incentive to property owners to actively monitor their property and to prevent the recurrence of felony drug transactions on their property. The City of Seattle essentially makes the same argument here. Though prevention of illegal drug activity is unquestionably a legitimate state interest, the Ohio court concluded:
We hold, however, that the mandatory closure provisions of R.C. 3767.06(A) do not substantially advance this interest when imposed against property owners who have not acquiesced to or participated in the illegal activity, and who have promptly abated the nuisance upon its discovery.
Pizza, 702 N.E.2d at 92. We agree with its conclusion.
The Ohio court noted the landlord's lack of authority to search tenants for drugs. The McCoys similarly lacked that authority. Neither the Ohio landlords nor the McCoys had any reliable basis to predict which people coming in the door would later become involved in illegal drug activity. Neither the landlords in Ohio nor the McCoys have legal authority nor resources to investigate that would make them individually a match for the illegal drug trade. However, in both cases the owners excluded the people engaged in illegal drug activity when that activity and those persons became known to them, and remained willing to do so in the future.[6]
Neither the state of Ohio nor the City in this case are satisfied by the fact that the owner informed police of illegal activity and excluded those known or suspected to be engaged in that activity. In fact, the mere report of the illegal activity would subject the property to abatement under the strict liability, absolute prevention policy argued both in Pizza and here. The Ohio court correctly observed that adopting such a position would be counter-productive:
Rather than substantially advancing the goal of encouraging property owners to monitor their property and take all legal steps to abate illegal activities thereon, this provision may actually discourage owners from reporting illegal activity.
Pizza, 702 N.E.2d at 92. On that basis the Ohio court struck down the Ohio statute.
We conclude that the imposition of a closure order pursuant to R.C. 3767.06(A) effectively closing real property against its use for any purpose for a period of one year does not advance a legitimate state interest when enforced against an innocent owner and that the state's interest does not outweigh the owner's interest in the economic use of his or her property. Therefore, the mandatory closure order provisions of R.C. 3767.06(A) violate the Takings Clause of the Fifth Amendment to the United States Constitution when imposed against an innocent owner.
Pizza, 702 N.E.2d at 93. The Pizza court's analysis supports our finding of a compensable taking without exception under nuisance law.
5. Summary
The common law nuisance exception turns on whether the court finds, based on the evidence, that the owner has taken reasonable steps to abate the nuisance activity based upon the actual or constructive knowledge of the owner about the existence of the activity and/or the identity of the actor. The McCoys' actions were found reasonable. Therefore, the City has not met its burden, under Lucas, of establishing a common law *172 nuisance exception to the taking of the McCoys' property. The Restatement (Second) of Torts and cases from other jurisdictions reinforce the conclusion that imposition of the closure order on the facts of this case is a taking under the Fifth Amendment to the United States Constitution for which compensation is required.
C. Second Prong of Presbytery
Because the McCoys have not alleged less than a total taking, we need not proceed to the second of the Presbytery lines of analysis: determining if a valid state interest exists and balancing that interest against the economic impact to the landowner. Guimont, 121 Wash.2d at 604, 854 P.2d 1. Had the court been proceeding under the more general nuisance statute and its common law equity powers and imposed conditions short of a categorical taking, we would employ this test. See Robinson v. City of Seattle, 119 Wash.2d 34, 51, 830 P.2d 318 (1992); Presbytery of Seattle v. King County, 114 Wash.2d 320, 335-36, 787 P.2d 907 (1990).
IV. DUE PROCESS CHALLENGE
The inquiry into due process would normally not be undertaken after resolving the case on the basis of takings clause infirmity. See Armendariz v. Penman, 75 F.3d 1311, 1326, (9th Cir.1996). However, this case is one of first impression. In the interest of comprehensive, timely disposition of the statute, we will undertake the due process analysis as well.
The due process test is set forth in Guimont: "(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner." 121 Wash.2d at 609, 854 P.2d 1 (quoting Presbytery, 114 Wash.2d at 330, 787 P.2d 907.). The legitimate purpose of preventing illegal drug activity is not at issue, the McCoys agree it is a legitimate interest.
The second question is whether the means are reasonably necessary to achieve the act's purpose. When the illegal activity is so intertwined with the legal business of the owner as to be indivisible, there is little question. Likewise, when an owner is a participant or knows and acquiesces in the illegal drug activity, this question requires little analysis. However, when the owner is not involved and neither knows of nor acquiesces in the illegal activity as or before it occurs, the question is closer. Here, the statute contemplates closure of the property for one year as the sole remedy if the court is not satisfied the owner can and will prevent the nuisance in the future. So, whether it is reasonably necessary is largely moot; it is the only statutory alternative.
The due process analysis will therefore hinge on the third question, whether it is unduly oppressive, weighed against a number of factors:
We determine if a statute is unduly oppressive by examining a number of nonexclusive factors to weigh the fairness of the burden being placed on the property owner:
On the public's side, the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the proposed regulation solves it and the feasibility of less oppressive solutions would all be relevant. On the owner's side, the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation and how feasible it is for the owner to alter present or currently planned uses.
Presbytery, 114 Wash.2d at 331, 787 P.2d 907 (citing Stoebuck, San Diego Gas: Problems, Pitfalls and a Better Way, 25 J. Urb. & Contemp. L 3, 33 (1983)).
Guimont, 121 Wash.2d at 610, 854 P.2d 1.
On the public's side of the analysis, drug activity is unquestionably a serious societal problem. No evidence suggests the illegal drug activity at Oscar's originates there. It may be conducted there, but it comes and goes with the patrons. The property has a sign posted prohibiting drug activity. Patrons are business invitees only for purposes *173 of bar and restaurant business. There is no evidence in the record that the drug activity is greater in the general area, specifically attributable to Oscar's. There is evidence in the record that the closure of other establishments in the general area caused an increase in illegal drug activity in Oscar's, but not that the existence of Oscar's or any other establishment has generally drawn drug activity to the area. The only evidence in the record of increased activity drawn to the area is that instance in which a police informant paged a drug dealer to set up a controlled buy at Oscar's. The dealer was seen driving up to the premises.
The closure of Oscar's would move the illegal drug activity out of that building, but there is no evidence it would stop the activity. There is no evidence it would even move the activity out of the general vicinity.
It could be argued that the drug abatement recommendations offered by police were less oppressive solutions offered to the McCoys in advance of abatement. Many were undertaken by the McCoys before the proceedings. Oscar McCoy testified some were implemented during the proceedings. All were aimed at discouraging illegal drug activity. But the City has not asserted that had the McCoys done everything asked of them, those measures would have guaranteed that the illegal drug activity would have been fully abated and prevented.
Any less aggressive solutions would require statutory provisions allowing the owner to make reasonable efforts to prevent and to intercede when illegal activity is detected. This would mean the court would need authority to impose reasonable conditions to be met over a reasonable time at a reasonable cost. Even then, these alternatives might have been feasible to reduce the activity. It is improbable they could have been guaranteed to prevent it. However, the statute does not presently impose an obligation on owners to take such actions, and it would need to be amended to allow less oppressive solutions to be imposed by the court.
On the McCoys' side of the analysis, the loss of value to them under the abatement order would be a total, temporary loss. While the record does not provide a dollar amount, it does demonstrate closure results in a complete loss. There are no other uses allowed on the face of the order or under the plain language of the statute. Under the order, the property would be closed to the McCoys for one year. The court would have custody of the property. The statute does allow the order to be cancelled if the court becomes satisfied that the owner will immediately abate any nuisance and prevent it for one year. The record is silent as to the nature of alternative uses for which the property is suitable. There is no evidence of what other business the court might find satisfactory. There is no record of potential economic costs to change use, nor whether it could be done in timely fashion in order to mitigate the impact of the order.
No evidence was presented that the McCoys should have anticipated the enactment of a statute which would close their property on account of illegal drug activity engaged in by customers. The McCoys expected they could call the police for help eliminating drug activity, and that the police would identify drug criminals so that they could be expelled. They did not expect the police to engage in secret drug buys without arresting the drug dealers and without identifying the dealers so that the McCoys could exclude them. The McCoys had no reason to anticipate losing their building on account of activity they could not detect, let alone prevent.
The Ohio court in Pizza concluded that their statute, which parallels Washington's, violated the federal due process clause:
Further, we hold that because there is no intentional wrongdoing, no departure from any prescribed standard of action, and no reckless conduct, and because landowners are not completely free to act as they choose due to landlord-tenant laws and other limitations on self-help evictions, forfeiture under these circumstances is so arbitrary and oppressive as to be a taking without due process of law in violation of the Fourteenth Amendment to the United States Constitution.
Pizza, 702 N.E.2d at 93. The statutory remedy in RCW 7.43, when applied to an innocent *174 owner for the illegal acts of patrons which were unknown to the owner and which were not acquiesced in by the owner, is unduly oppressive. The statute allows no alternative remedy. Curtailing illegal drug use is a valid state interest, but not one which justifies closure of Oscar's on these facts. RCW 7.43 as applied to the McCoys, violates due process under the Fourteenth Amendment to the Constitution.
V. VAGUENESS
Having decided this case on Fifth Amendment Takings and Fourteenth Amendment Due Process grounds, we decline to analyze whether the trial court's application of RCW 7.43 violated other aspects of the McCoys' due process rights. We therefore will not address the McCoys' void-for-vagueness argument.
VI. EVIDENTIARY ISSUES
The fourth assignment of error by the McCoys is the erroneous admissibility of hearsay evidence purporting to be the statements of confidential drug informants who did not testify and who were not made available for deposition. The McCoys have not preserved these issues by properly objecting to the testimony at trial. State v. Brush, 32 Wash.App. 445, 648 P.2d 897 (1982).
VII. DISPARATE IMPACTS ON AFRICAN-AMERICANS
The court was invited by amicus Pacific Northwest Chapter of the National Black Chamber of Commerce to consider disparate impacts of the enforcement of RCW 7.43 by the City of Seattle on African-Americans. The record before the court is that of application to Oscar's only. The court has no record before it on which to conduct such an analysis. See also Noble Manor Co. v. Pierce County, 133 Wash.2d 269, 272 n. 1, 943 P.2d 1378 (1997) (explaining that courts do not ordinarily review issues raised solely by amicus curiae).
VIII. ATTORNEY FEES
Amicus for Northwest Legal Foundation urges the awarding of McCoys' attorney fees and costs. The McCoys have not cited the takings fee statute nor otherwise requested attorney fees as required under RAP 18.1. No attorney fees are awarded.

CONCLUSION
The drug abatement statute, RCW 7.43, is an unconstitutional taking of property without compensation as applied under the Fifth Amendment in this case. It is also a violation of due process as guaranteed under the Fourteenth Amendment to the United States Constitution. The order of the trial court is vacated.
AGID, C.J., and ELLINGTON, J., concur.
NOTES
[1] The following parties were granted permission to submit amicus briefs: Northwest Legal Foundation; Washington Association of Prosecuting Attorneys; Rainier Chamber of Commerce and Downtown Seattle Association; Washington State Association of Municipal Attorneys; American Civil Liberties Union of Washington; and Pacific Northwest Chapter of the National Black Chamber of Commerce.
[2] Although the McCoys lease the property that is the subject of this appeal, the parties do not dispute that they are considered "[o]wners." As tenants, the McCoys possess a valuable interest in the real property. See Folsom v. Spokane County, 106 Wash.2d 760, 762, 725 P.2d 987 (1986).
[3] Issues of violence, liquor law violations, or gang activity are not a consideration for purposes of the drug nuisance statute, RCW 7.43, only illegal drug activity is considered.
[4] The trial court's memorandum decision is referenced in Finding of Fact No. 26.
[5] The McCoys do not argue that an independent analysis under the Washington Constitution is proper as required by State v. Gunwall, 106 Wash.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986).
[6] This is a proceeding in equity. On the record before us, the trial court could well have found that the McCoys had abated all nuisance activities of third parties who were known to them. But for the literal reading of the statute, the court could have declined on equitable grounds to apply the remedy of abatement of the building absent an opportunity for the McCoys to exclude the offenders known to law enforcement but not to the McCoys. The McCoys stood willing to exclude violators known to them.